486 F.2d 706
 73-2 USTC P 9722
 Richard V. BISCEGLIA, as Vice President of the Commercial
Bank, Middlesboro, Kentucky, Respondent-Appellant,
v.
UNITED STATES of America and B. L. Brutscher, Special Agent,
Internal Revenue Service, Petitioners-Appellees.
 No. 72-1783.
 United States Court of Appeals,
Sixth Circuit.
 Argued Feb. 2, 1973.
Decided Oct. 18, 1973.
 
 Mary J. McGinn, Tax Div., Dept. of Justice, Washington, D. C., for petitioners-appellees; Scott P. Crampton, Asst. Atty. Gen., Meyer Rothwacks, Crombie J. D. Garrett, Attys., Tax Div., Dept. of Justice, Washington, D. C., on brief; Eugene E. Siler, Jr., U. S. Atty., Moss Noble, Asst. U. S. Atty., of counsel.
 William A. Watson, Middlesboro, Ky., for respondent-appellant; Watson & Watson, Middlesboro, Ky., of counsel.
 Before McCREE and LIVELY, Circuit Judges, and KENNEDY,* District Judge.
 McCREE, Circuit Judge.
 
 
 1
 This appeal requires us to determine whether the Internal Revenue Service may use a civil summons to compel a third party to produce for examination records pertaining to the financial affairs of unspecified and unidentified persons and organizations for the purpose of ascertaining their identities. We hold that it may not.
 
 
 2
 The facts of the case are not disputed. On November 6, 1970, and on November 16, 1970, the Cincinnati branch of the Federal Reserve Bank of Cleveland received deposits of currency from the Commercial Bank of Middlesboro, Kentucky. Each deposit included $20,000 in one-hundred dollar bills which were "tissue paper thin" and in such a badly deteriorated condition that they were no longer fit for circulation. (Appendix at 22) Accordingly, the Cincinnati Branch of the Federal Reserve Bank destroyed them.
 
 
 3
 Apparently pursuant to federal reporting requirements,[1] the Cincinnati branch of the Federal Reserve Bank reported these deposits to the Internal Revenue Service (IRS). The report informed the IRS of the "deteriorated condition" of the bills "apparently [resulting] from [a] long period of storage."[2]
 
 
 4
 The Intelligence Division of the IRS, suspecting that this money may not have been properly reported for income tax purposes by the person or persons who had transferred it to the Commercial Bank, assigned Special Agent B. L. Brutscher to investigate possible criminal violations of the tax laws. During his investigation, Brutscher, allegedly pursuant to section 7602 of the Internal Revenue Code, 26 U.S.C. Sec. 7602 (1967),[3] caused a summons, "In the matter of the tax liability of John Doe," served on Richard V. Bisceglia, vice president of the Commercial Bank, requesting that he testify and bring with him
 
 
 5
 [t]hose books and records which will provide information as to the person(s) or firm(s) which deposited, redeemed or otherwise gave to the Commercial Bank $100 bills U. S. Currency which the Commercial Bank sent in two shipments of (200) two hundred each $100 bills to the Cincinnati Branch of the Federal Reserve Bank on or about November 6, 1970 and November 15, 1970.
 
 
 6
 When Bisceglia refused to comply with the summons, Special Agent Brutscher, pursuant to sections 7402(b) and 7604(a) of the Internal Revenue Code, 26 U.S.C. Secs. 7402(b), 7604(a) (1967),[4] filed a petition in United States District Court to enforce the summons. At the hearing on the petition, evidence was adduced showing that it was unusual for the Commercial Bank to deposit with the Federal Reserve Bank so large an amount of money of one hundred dollar denominations and so large a number of bills in such a deteriorated condition. Although the IRS thought that there might be tax liability for 1970 because it appeared that someone might have been hoarding money for a considerable period of time in an unusual storage place, the IRS admitted that it neither suspected nor was it investigating a particular person or taxpayer. Instead, the purpose of the summons was to ascertain the identity of that person or those persons who had transferred the deteriorated bills to the Commercial Bank and then to determine whether anyone was liable for income taxes. Bisceglia testified that the bank had both cash and deposit tickets for the period in question. He explained, however, that only deposit tickets disclose the identity of a person making a deposit. Cash tickets show only the amount of cash deposited and the identity of the teller who received the deposit. He also informed the court that the bank keeps no records of exchange transactions, that is, transactions in which an individual exchanges his currency for new currency or for currency of different denominations.
 
 
 7
 In opposition to the enforcement of the summons, Bisceglia urged four affirmative defenses: (1) the summons was neither authorized by section 7602 of the Internal Revenue Code nor was it valid under the Fourth Amendment because it failed to specify the identity of the taxpayer being investigated; (2) a section 7602 civil summons was improper because the dominant purpose of the investigation was criminal; (3) the general nature of the summons made it impossible and impracticable for the bank to notify every taxpayer who had transacted business with the bank during the period of time in question and therefore denied the bank's customers their right to challenge its enforcement; and (4) the IRS had not acted in good faith in issuing the summons.
 
 
 8
 The district court, on June 1, 1972, rejected Bisceglia's affirmative defenses and ordered the bank to make available to the IRS those records reasonably related to the investigation. To avoid overburdening the bank and unnecessarily disclosing the transactions of bank customers that were not relevant to the IRS inquiry,[5] the court specified the records required as
 
 
 9
 those deposit tickets, if any, of the Commercial Bank, Middlesboro, Kentucky, which reflect cash deposits during the period from October 16, 1970, through November 16, 1970, in the amount of $20,000.00, and those deposit tickets, if any, of said bank which reflect cash deposits involving one hundred dollar bills totaling amounts equal to or in excess of $5,000.00 per deposit for a like period.
 
 
 10
 Bisceglia has appealed from this order, the enforcement of which was stayed pending this appeal on July 14, 1972, and contends first, that the summons and subsequent order enforcing the summons are not authorized by section 7602 of the Internal Revenue Code, 26 U.S.C. Sec. 7602 (1867), and second, that they violate the Fourth Amendment's prohibition of unreasonable searches and seizures. Because we find that the summons and the order enforcing the summons are not authorized by the Internal Revenue Code, we do not reach the constitutional question.
 
 
 11
 In enacting section 7602 of the Internal Revenue Code, Congress specified the purposes for which the Internal Revenue Service is authorized to issue a summons as follows:
 
 
 12
 [f]or the purpose of ascertaining the correctness of any return, making a return where none has been made, determining the liability of any person for any internal revenue tax or the liability at law or in equity of any transferee or fiduciary of any person in respect of any internal revenue tax, or collecting any such liability. . . 26 U.S.C. Sec. 7602 (1967).
 
 
 13
 In this section, Congress has not authorized the IRS to examine records pertaining to the financial affairs of an indefinite number of unspecified persons for the purpose of ascertaining the identity of one or some of those persons who may be taxpayers and liable for taxes. Instead, the section presupposes that the IRS has already identified the person in whom it is interested as a taxpayer before proceeding. Even the IRS summons form, Treasury Department Form 2039, acknowledges this presupposition because it begins with the words "In the matter of the tax liability of _____," and informs the recipient of the summons that he is required to appear and give testimony "relating to the tax liability or the collection of the tax liability of the above named person. . . ." In this case, the IRS has inserted the name "John Doe" into the space provided for the name of the taxpayer under investigation, and it admits that the name is fictitious and that no person of that name is under investigation.
 
 
 14
 Although courts are required to "liberally construe the powers given the governmental agency" by section 7602 of the Internal Revenue Code, here, the district court's sweeping interpretation of this section has gone beyond mere statutory construction. United States v. Giordano, 419 F.2d 564, 569-570 (5th Cir. 1969), cert. denied 397 U.S. 1037, 90 S.Ct. 1355, 25 L.Ed.2d 648 (1970). In the past, whenever the IRS has sought to use its summons power as an exploratory or identifying device to compel the production of records pertaining to a group of otherwise unidentified persons in the hope of discovering whether persons in this group may be taxpayers or, if so, may be liable for income taxes, courts have moved swiftly to arrest or curtail the attempt. When the IRS seeks to obtain records from persons not themselves under investigation for the purpose of investigating others whose identity is known, courts have been particularly careful to ensure that investigation of the taxpayer and not a sweeping exploratory search is its object.[6]
 
 
 15
 Thus, in Mays v. Davis, 7 F.Supp. 596 (W.D.Pa.1934), decided under the predecessor of section 7602, the court refused to require a trust officer of a trust company to produce for IRS examination all records disclosing the "names and addresses of the beneficiaries of trusts created by will where the widow, a beneficiary, has elected to take under the will . . . where the will provides for payment to her of income of the trust estate; and where income was paid to the widow" and all records showing "the name of each such trust." Id. at 596. The court properly characterized this summons as merely exploratory. The IRS, having no identifiable taxpayer under investigation, was seeking information about a group of persons having common characteristics in the hope of discovering some tax liability.
 
 
 16
 In First Nat. Bank of Mobile v. United States, 160 F.2d 532 (5th Cir. 1947), the court, also interpreting the predecessor of section 7602, refused to enforce a summons during an IRS investigation of several named taxpayers, that required a bank "to produce for inspection and examination . . . any and all books, papers and records of whatever nature, irrespective of whether such records also pertain to similar transactions with other persons or firms. . . ." Id. at 533. (emphasis added). The court, finding that the order exceeded the scope of the statute, struck the italicized part of the order and substituted "which pertain to or reflect the issuance of cashier's checks . . . [which bear upon, or have reference to the federal] tax liability of the above named firm and individuals. . . ." Id. In denying a petition for rehearing, the court added that "[n]either the revenue agent nor the Court has authority under the statute to require the production of memoranda, books, etc., of third parties unless they have a bearing upon the return or returns under investigation." Id. at 534.
 
 
 17
 In enacting section 7602 of the Internal Revenue Code, Congress intended to make "no material change [in] existing law." H.R.Rep.No.1337, 83d Cong., 2d Sess. (1954); S.Rep.No.1622, 83d Cong., 2d Sess. (1954); U.S.Code Cong. and Admin.News, 1954, p. 4025 et seq. Accordingly, courts have continued to refuse to sanction IRS "John Doe" summonses issued to third parties for the purpose of examining their records pertaining to the affairs of a particular group of persons when no identifiable taxpayer is under investigation.
 
 
 18
 In United States v. Humble Oil & Refining Co., 246 F.Supp. 944 (S.D.Tex. 1972), the IRS sought from Humble Oil the identities of lessors of mineral rights to whom the company had surrendered expired mineral leases without having extracted any minerals in order to determine whether these lessors had remembered to restore in their most recent tax returns the depletion allowances which they had claimed during the life of the lease. The IRS, upon admitting that it had neither the oil company nor any particular lessor, lease or land under investigation, was not permitted to use the summons power granted in section 7602 as a tool for research and exploration. The court found that "Congress intended that a person or persons or particular returns be under scrutiny by the Internal Revenue Service before such a summons can be issued." Id. at 947.
 
 
 19
 Similarly, in United States v. Theodore, 479 F.2d 749 (4th Cir. 1973), the court refused to uphold an order enforcing a summons that required an accounting firm to produce all the income tax returns and any and all related material pertaining to all its clients for a three year period. The summons was issued as part of a nationwide investigation of tax preparation firms to determine whether these firms were fairly computing the tax liabilities of their clients. In the course of the investigation, the IRS became suspicious of the Theodore accounting firm after the firm had prepared an incorrect tax return for one of its agents posing as a customer. The purpose of the summons was to determine whether the firm had made similar incorrect returns for other customers and, if it had, to determine their correct tax liability. The summons, characterized as "'a rambling exploration' of a third party's files" was unenforceable because section 7602 "only allows the IRS to summon information relating to the correctness of a particular return or to a particular person and does not authorize the use of open-ended Joe [sic] Doe summonses." Id. at 754, 755.
 
 
 20
 We believe that these cases control the disposition of this appeal. Here, the IRS has requested and the district court has approved a summons directed to a third party, the Middlesboro Commercial Bank to produce for inspection bank records relating to a group of persons who either deposited $20,000 at one time or who made deposits of one hundred dollar bills exceeding $5,000 at one time. The IRS has admitted that it has no particular taxpayer under investigation and that it desires the records solely for the purpose of obtaining the identities of persons and firms who made deposits of the nature described. It does not seek the records "[f]or the purpose of ascertaining the correctness of any return," for the purpose of "making a return where none has been made," for the purpose of "determining the liability of any person for any internal revenue tax or the liability at law or in equity of any transferee or fiduciary of any person in respect of any internal revenue tax, or" for the purpose of "collecting any such liability" as required by section 7602 of the Internal Revenue Code. In short, the IRS has not made the demonstration requisite for the enforcement of a summons-that it seeks third party records pertaining to the income tax liability of a particular taxpayer in whom it is interested. Instead, the IRS has been granted a summons enabling it to inquire into the financial affairs of a group of unspecified persons in the hope of identifying one or more of them as the person or persons who transferred deteriorated bills to the Commercial Bank, a purpose not authorized by section 7602 of the Internal Revenue Code.
 
 
 21
 We believe, therefore, that Tillotson v. Boughner, 333 F.2d 515 (7th Cir.), cert. denied 379 U.S. 913, 85 S.Ct. 260, 13 L.Ed.2d 184 (1964) and the related case of Schulze v. Rayunec, 350 F.2d 666 (7th Cir. 1965), cited by the IRS, are inapposite. In those cases, the court ordered enforced section 7602 summonses issued to a third party bank and an attorney during an investigation in which the IRS sought the identity of the person for whom the attorney had obtained a cashier's check for $215,499.95 from the bank. The attorney had sent the check to the IRS accompanied by a letter that informed the IRS that the check was for unpaid taxes owed by an anonymous taxpayer. The IRS sought his identity from the attorney, whose claim of attorney-client privilege was upheld in Tillotson v. Boughner, 350 F.2d 663 (7th Cir. 1965), and from the bank, which was ordered to disclose the identity of the taxpayer whose money had been used to purchase a cashier's check from it. The court, in the earlier Tillotson case, was careful to distinguish the Mays case, supra, on the ground that in Tillotson not only did "a taxpayer" exist but also that the bank was requested to assist in determining that "specific taxpayer's liability." 333 F.2d at 516. (Emphasis in opinion). The court did not sanction an examination of bank records pertaining to the affairs of a class of persons when no particular, specific taxpayer was under investigation.
 
 
 22
 We decline to do by interpretation that which Congress has declined to do by legislation. The IRS is not authorized to issue a summons to a third party to compel production of that party's records except in furtherance of an investigation of the possible tax liability of specified taxpayers.
 
 
 23
 Reversed and remanded with instructions to deny enforcement of the summons.
 
 
 
 *
 The Honorable Cornelia G. Kennedy, United States District Judge for the Eastern District of Michigan, sitting by designation
 
 
 [1]
 In their briefs, both parties refer to a Form TCR-1, a copy of which was filed by the Cincinnati branch of the Federal Reserve Bank with the IRS. This form entitled "Report of Currency Transactions" requires three primary kinds of information: (1) the name, address, and business, occupation or profession of the person or organization initiating the transactions reported; (2) a description of the transactions reported, that is, the total amount of the currency involved, the amount of denominations of $100 or higher, and whether the transaction was a deposit, withdrawal, or exchange of currency, or the cashing or purchasing of a check; and (3) the name and address of the financial institution reporting. The obligation of financial institutions to provide this information is imposed by 31 C.F.R. Secs. 102.1-.4 (1972) (Instructions Relating to Reports of Currency Transactions). This regulation provides:
 Sec. 102.1 Reports of currency transactions required.
 Commencing with transactions occurring in the month of August 1959, every financial institution in the United States shall file monthly reports on Form TCR-1 concerning each deposit or withdrawal, or other payment or transfer, effected by, through, or to such financial institution, which involves transactions in United States currency as follows:
 (a) Transactions involving $2,500 or more of United States currency in denominations of $100 or higher;
 (b) Transactions involving $10,000 or more of United States currency in any denominations, and
 (c) Transactions involving any amount in any denominations, which in the judgment of the financial institution exceed those commensurate with the customary conduct of the business, industry or profession of the person or organization concerned.
 Sec. 102.2 Filing of reports.
 Reports on Form TCR-1 shall be filed on or before the 15th day of the month following that in which the reported transactions occur, with the Federal Reserve Bank of the district in which the reporting financial institution is located. All information called for in such form shall be furnished. A supply of Form TCR-1 may be obtained upon request directed to any Federal Reserve Bank.
 Sec. 102.3 Identification required.
 No financial institution shall effect any transaction with respect to which a report is required unless the person or organizations with whom such transaction is to be effected has been satisfactorily identified.
 Sec. 102.4 Definitions.
 As used in this part "payment or transfer" shall include exchange of currency; and "financial institutions" shall mean banks, trust companies, savings banks, private bankers, investment bankers, building and loan associations, securities and commodities brokers, and currency exchanges and other persons or organizations engaged primarily in cashing and exchanging currency.
 It appears that this regulation did not require the Cincinnati branch of the Federal Reserve Bank to file Form TCR-1. It does appear, however, that this regulation required the Commercial Bank in this case to file a Form TCR-1 in which, of course, the information sought by the IRS in this proceeding would have been disclosed.
 It should also be noted that after the events that are the subject of this litigation had transpired, the Currency and Foreign Transactions Reporting Act of 1970, 31 U.S.C. Secs. 1051 et seq. (Supp.1973), became effective. This Act requires similar disclosures by financial institutions. A part of this Act and a regulation promulgated thereunder requiring domestic financial institutions to report any currency transaction with any customer involving more than $10,000 has been declared unconstitutional. Stark v. Connally, 347 F.Supp. 1242 (N.D.Cal.1972) (appeal pending).
 
 
 [2]
 At the hearing before the United States District Court, the employee of the Federal Reserve Bank who had noticed the deteriorated condition of the bills deposited by the Commercial Bank testified that to the best of his knowledge, "there was only one parallel situation and that was several years ago where a large hoard of money was found that was in comparable condition. It was stored in milk cans that were buried in concrete."
 
 
 [3]
 26 U.S.C. Sec. 7602 (1967), "Examination of books and witnesses," provides:
 For the purpose of ascertaining the correctness of any return, making a return where none has been made, determining the liability of any person for any internal revenue tax or the liability at law or in equity of any transferee or fiduciary of any person in respect of any internal revenue tax, or collecting any such liability, the Secretary or his delegate is authorized-
 (1) To examine any books, papers, records, or other data which may be relevant or material to such inquiry;
 (2) To summon the person liable for tax or required to perform the act, or any officer or employee of such person, or any person having possession, custody, or care of books of account containing entries relating to the business of the person liable for tax or required to perform the act, or any other person the Secretary or his delegate may deem proper, to appear before the Secretary or his delegate at a time and place named in the summons and to produce such books, papers, records, or other data, and to give such testimony, under oath, as may be relevant or material to such inquiry; and
 (3) To take such testimony of the person concerned, under oath, as may be relevant or material to such inquiry.
 The IRS has also argued on appeal that 26 U.S.C. Sec. 7601 (1967) authorizes the issuance and the enforcement of its summons in this case. That section provides:
 Canvass of districts for taxable persons and objects
 (a) General rule.-The Secretary or his delegate shall, to the extent he deems it practicable, cause officers or employees of the Treasury Department to proceed, from time to time, through each internal revenue district and inquire after and concerning all persons therein who may be liable to pay any internal revenue tax, and all persons owning or having the care and management of any objects with respect to which any tax is imposed.
 Section 7601, however, merely "flatly imposes upon the Secretary the duty to canvass and to inquire." Donaldson v. United States, 400 U.S. 517, 523, 91 S.Ct. 534, 539, 27 L.Ed.2d 580 (1971). Accordingly, we do not believe that Congress intended to provide in this section grounds additional to those specified in section 7602 for the issuance of a summons.
 
 
 [4]
 26 U.S.C. Sec. 7402(b) (1967), conferring jurisdiction upon the United States District Courts, provides:
 (b) To enforce summons.-If any person is summoned under the internal revenue laws to appear, to testify, or to produce books, papers, or other data, the district court of the United States for the district in which such person resides or may be found shall have jurisdiction by appropriate process to compel such attendance, testimony, or production of books, papers, or other data.
 26 U.S.C. Sec. 7604(a) (1967), relating to the enforcement of summons, provides:
 (a) Jurisdiction of district court.-If any person is summoned under the internal revenue laws to appear, to testify, or to produce books, papers, records, or other data, the United States district court for the district in which such person resides or is found shall have jurisdiction by appropriate process to compel such attendance, testimony, or production of books, papers, records, or other data.
 
 
 [5]
 At the hearing before the United States District Court, Bisceglia testified that the Commercial Bank processes approximately 1,250 to 1,500 cash tickets and 600 to 700 deposit tickets daily
 
 
 [6]
 In Local 174 v. United States, 240 F.2d 387 (9th Cir. 1956), the IRS, allegedly pursuant to Sec. 7602, issued a summons to a union local to produce any and all of its records for a five year period pertaining to any transaction between the Local and its president, Brewster, his wife and any of their agents. The court, characterizing the summons as a request for "a blanket turnover for an unlimited time," found that the Local, as a third party, was not "required to produce any item or document unless it was (1) in his possession, (2) relevant to the tax liability of the Brewsters or either of them, or (3) material to the inquiry." Id. at 391. The summons was general, not particularized, and therefore unenforceable
 Even when the IRS seeks records held by a taxpayer who is under investigation, its power to examine records is not unlimited. Thus in In re International Corporation Co., 5 F.Supp. 608 (S.D.N.Y.1934), the court refused to order a taxpayer whose tax liability was under investigation to disclose the names of the foreign corporations that the taxpayer had helped organize because "the particular name of a corporation organized by petitioner would seem to have nothing whatsoever to do with the correctness of the income, or the deductions, reported in its return." Id. at 612.
 In McDonough v. Lambert, 94 F.2d 838 (1st Cir. 1958), the court refused to order a taxpayer under investigation to disclose the name of an attorney to whom the taxpayer had allegedly paid $10,000 for legal services because even if that expense were disallowed, the tax liability of the taxpayer (who had sustained a loss of over $100,000 that year) would be unaffected. In refusing to uphold the order enforcing the summons, the court explained:
 We do not think the provisions of this section can be given such a broad construction; that by its terms it is more limited in scope and confined to the procurement of evidence, oral or documentary, bearing upon matters required by law to be included in a given tax return to determine the correct tax liability of the person who made the return or who failed to make one, and was not intended to authorize the procurement of evidence that might be material in verification of the tax return of some other person, not known to the Bureau of Internal Revenue, and who may or may not have made a return . . .. Id. at 841.