**UNITED STATES of America and Daniel J. Morrissey, Jr., Estate Tax Attorney of the Internal Revenue Service**

v.

**Norman E. ARMOUR, as Senior Vice President of Connecticut Bank and Trust Company.**

**UNITED STATES of America and Christopher A. Bird, Estate Tax Attorney of the Internal Revenue Service**

v.

**Richard H. DIONNE, as Vice-President of Hartford National Bank and Trust Company.**

**UNITED STATES of America and Thomas R. O'Neil, Estate Tax Attorney of the Internal Revenue Service**

v.

**Louis PELLINO, as Senior Vice President of United Bank and Trust Company.**

**UNITED STATES of America and William W. Glime, Revenue Agent of the Internal Revenue Service**

v.

**Richard L. RICE, as Vice President of First New Haven National Bank.**

**UNITED STATES of America and John F. O'Brien, Revenue Agent of the Internal Revenue Service**

v.

**Michael J. ZINKIEWICZ, as Senior Vice President of the Union Trust Company.**

**Civ. Nos. H-74-102 to H-74-104, H-74-107 and H-74-108.**

United States District Court, D. Connecticut.

April 25, 1974.

As Modified June 25, 1974.

Stewart H. Jones, U. S. Atty., Peter Mear, Asst. U. S. Atty., New Haven, Conn., for plaintiff.

Thomas J. Groark, Jr., Hartford, Conn., for Norman E. Armour.

John M. Donahue, George C. Hastings, Hartford, Conn., for Richard H. Dionne.

J. Read Murphy, Hartford, Conn., for Louis Pellino.

Richard G. Bell, Peter A. Kelly, New Haven, Conn., for Richard L. Rice.

William J. Doyle, New Haven, Conn., for Michael J. Zinkiewicz.

## MEMORANDUM OF DECISION

BLUMENFELD, District Judge.

These cases concerned summonses issued by estate tax attorneys of the Internal Revenue Service (IRS) to executives of five Connecticut banks. The summonses directed the banks' production of "The names, addresses, and Social Security or employee's identification numbers of all shareholders of the Hartford Fire Insurance Company for whom you held shares in any capacity, including but not limited to, as nominee, custodian, trustees and/or agent on May 25, 1970. In addition please furnish the number of shares so held for each such shareholder." The summonses resulted from the Service's revocation on March 6, 1974, of its earlier ruling that the 1970 exchange of Hartford Fire Insurance Company (Hartford) shares for Series 'N' Preferred stock in the International Telephone and Telegraph Corporation (ITT) was a tax free transaction. By revoking this ruling, the IRS adopted the position that the exchanging Hartford shareholders realized a gain or loss of income in 1970, depending on the basis for each exchanged Hartford share. Because the three year statute of limitations applicable to returns filed for the 1970 calendar year bars the IRS from instituting proceedings to recoup back taxes from exchanging Hartford shareholders after April 15, 1974, the revocation of the ruling regarding the Hartford-ITT exchange occasioned frantic activity by the IRS to identify the exchanging shareholders and to preserve the Service's rights of recovery against such shareholders either by obtaining waivers of the statute of limitations or by filing notices of deficiencies. Most of the exchanging shareholders were identified through the shareholder lists of Hartford and ITT. But many shares are indicated on these lists as being held by trust departments of banking institutions as nominees for the beneficial owners. The instant actions were part of an effort by the IRS in several jurisdictions to obtain the names of such

beneficial owners. Jurisdiction over such actions is conferred on this Court by 26 U.S.C. § 7604(a).

Because time was of the essence, the Court ruled from the bench on April 5, 1974, following oral argument and research in chambers, that the summonses were valid and enforceable. The instant petitions to enforce the summonses were granted. Production of the requested information took place that same day pursuant to the Court's order. This memorandum follows in amplification of the views expressed orally by the Court.

## I.

The banks objected to enforcement of the summonses on both procedural and substantive grounds. The Court's rejection of the procedural point sprung readily from the well-reasoned decision of Judge Tenney on precisely the same issue in United States v. First National City Bank, No. M 18–304 (S.D.N.Y., April 4, 1974), a copy of which was before the Court at the time of its ruling.

The procedural problem before the Court, as before Judge Tenney, was basically one of whether a change in the Treasury Department's procedure for delegating the Secretary's statutory power to issue summonses under § 7602 of the Internal Revenue Code of 1954, 26 U.S.C. § 7602, had resulted in a lapse in the authority of estate tax attorneys to issue such summonses. The banks opposing production pointed to Treasury Decision 7297, filed December 18, 1973, 38 Fed.Reg. 34803 (1973), amending 26 C.F.R. Part 301, which governs the procedure and administration of § 7602. The preamble to the Treasury Decision stated that one of the objectives of the amendments was to "remove the authority of certain designated Internal Revenue Service personnel to issue summons [sic], serve a summons, administer an oath, etc., and [to] give that authority to the Commissioner. It is anticipated that the Commissioner in turn will issue delegation orders empowering appropri-

ate Internal Revenue Service personnel to perform the various tasks." Accordingly, T.D. 7297 deleted 26 C.F.R. § 301.7602–1(c), the paragraph theretofore providing estate tax examiners with the authority to issue summonses under § 7602 of the Code, and amended 26 C.F.R. § 301.7602–1(b) to delegate solely to the Commissioner the authority to issue such summonses. The banks contended that because the Commissioner had not, since the date of T.D. 7297, in fact issued the delegation orders contemplated in the preamble, the summonses issued by estate tax attorneys in these cases were invalid as a matter of law.

It was Judge Tenney's finding, however, that T.D. 7297 did nothing to disturb the revised Delegation Order No. 4 previously issued by the Commissioner on April 30, 1973, 38 Fed.Reg. 12136 (1973), which delegated authority to issue summonses under § 7602 to, among other subordinates of the Commissioner, " . . . Attorneys, Estate Tax; and Estate Tax Examiners." Del.Ord.No. 4 (Rev. 2), ¶ 1(f). Judge Tenney noted that the Commissioner had had the authority to issue summonses at the time he had delegated this authority on April 30, 1973, despite the fact that it was not until T.D. 7297, some seven and one-half months later, that this authority was explicitly delegated to the Commissioner by the Secretary in 26 C.F.R. § 301.-7602–1(b), as amended. Prior to T.D. 7297, the Secretary had by 26 C.F.R. § 301.7602–1(c) delegated authority to issue summonses directly to subordinates of the Commissioner, and 26 C.F.R. § 301.7701–9(b) expressly provided that such a delegation to a subordinate of the Commissioner "shall constitute a delegation by the Secretary to the Commissioner of the authority to perform such function and a redelegation thereof by the Commissioner to the designated officer or employee." Thus revised Delegation Order No. 4 was in no way *ultra vires* the Commissioner. It represented a decision to begin delegating the Commissioner's authority to issue summonses through the internal IRS device of

Delegation Orders rather than through the more cumbersome process of Treasury Decisions amending provisions of the Code of Federal Regulations, so that delegations of the authority to issue summonses could more easily be kept current with changing IRS job titles. The appearance many months later of T.D. 7297 merely completed the re-ordering of the delegation process begun by the April 30, 1973, revision of Delegation Order No. 4, in no way abrogating revised Delegation Order No. 4 while emphatically demonstrating the delay inherent in rearranging lines of delegation by effecting an amendment to the Code of Federal Regulations vis-à-vis issuing a revised Delegation Order. Judge Tenney accordingly found the summonses before him to be procedurally valid, and following in Judge Tenney's comfortable footsteps, this Court ruled that the summonses herein concerned had been issued by IRS personnel duly and validly authorized to issue such summonses.

## II.

■ The banks' substantive objection to the summonses was based on the summonses' alleged lack of specificity and consequent failure to conform in scope to the inquiry authorized to be undertaken by summons under § 7602. The crux of this problem was the summonses' failure to identify any particular individual as being under investigation. Since this issue was not raised before Judge Tenney, the Court had to deal with the problem as one of first impression, at least in the context of the instant cases.

On its face § 7602 would seem clearly to have provided sufficient authority for the summonses here in issue. That section provides in pertinent part:

"For the purpose of ascertaining the correctness of any return, making a return where none has been made, determining the liability of any person for any internal revenue tax or the liability at law or in equity of any transferee or fiduciary of any person

in respect of any internal revenue tax, or collecting any such liability, the Secretary or his delegate is authorized . . .

(2) To summon the person liable for tax or required to perform the act, or any officer or employee of such person, or any person having possession, custody, or care of books of account containing entries relating to the business of the person liable for tax or required to perform the act, or any other person the Secretary or his delegate may deem proper, to appear before the Secretary or his delegate at a time and place named in the summons and to produce such books, papers, records, or other data, and to give such testimony, under oath, as may be relevant or material to such inquiry . . . ."

However, § 7602 has been construed as subject to an implied limitation that the Service must be engaged in an actual investigation of some specific, suspected tax liability of actual persons rather than an exploratory foray to examine the mere possibility of the tax liability of persons who may or may not exist. This limiting construction appears to have arisen in cases dealing with the predecessors to § 7602. Thus, the first such case, Mays v. Davis, 7 F. Supp. 596 (W.D.Pa.1934), dealt with § 618 of the Revenue Act of 1928, former 26 U.S.C. § 1247, which authorized a summons solely "for the purpose of ascertaining the correctness of any return or for the purpose of making a return where none has been made." This purpose clause was expressly adverted to by the court in Mays v. Davis in its holding that § 618 did not authorize a summons requesting a trust company to reveal the names of the beneficiaries of a certain sort of trust, since this amounted to "a mere exploratory search for information" which the Service could obtain by searching its own files. 7 F.Supp. at 596. It was in regard to the same § 618 that the First Circuit later held: "We do not think the provisions of this sec-

tion can be given . . . a broad construction; that by its terms it is . . . limited in scope and confined to the procurement of evidence, oral or documentary, bearing upon matters required by law to be included in a given tax return to determine the correct tax liability of the person who made the return or who failed to make one, and was not intended to authorize the procurement of evidence that might be material in verification of the tax return of some other person, not known to the Bureau of Internal Revenue, and who may or may not have made a return . . ." McDonough v. Lambert, 94 F.2d 838, 841 (1st Cir. 1938). The purpose clause of § 618 was repeated verbatim in § 3614 of the Internal Revenue Code of 1939, on the basis of which the Fifth Circuit held that the agent issuing the summons "must specify with sufficient precision for their identification the documents desired to be inspected . . . [The agent's] demands will not be complied with if they are too general, too wanting in specification, as to indicate that they are merely exploratory fishing expeditions." First Nat'l Bank of Mobile v. United States, 160 F.2d 532, 534 (5th Cir. 1947).

The foregoing reference to the differences in wording between § 7602 and its predecessors is not meant to dispute these statutes' essential similarity.[1] However, it is felt that the revised wording of § 7602 cautions against blind extrapolation of policy statements framed in the context of the earlier statutes. The distinction between an investigatory and a more general exploratory purpose, between information sought in relation to a specific, suspected liability of an actual taxpayer or group of taxpayers and information sought for its own sake in the manner of a research project, retains current validity as a

sound application of principles developed under predecessors to § 7602. See United States v. Humble Oil & Refining, 346 F.Supp. 944 (S.D.Tex.1972), aff'd 488 F.2d 953 (5th Cir. 1974). But see also United States v. Clayton, 369 F. Supp. 6 (S.D.Miss.1973). But this Court found no support, either under the pre-1954 cases or, *a fortiori,* under § 7602, for the expansive reading of Bisceglia v. United States, 486 F.2d 706, 712–713 (6th Cir. 1973), cert. granted —— U.S. ——, 94 S.Ct. 1931, 40 L.Ed.2d 285 (1974), which was urged upon the Court by the banks opposing enforcement of the petitions here in issue.

*Bisceglia* expressed the propositions that courts must "refuse to sanction IRS 'John Doe' summonses issued to third parties for the purpose of examining their records pertaining to the affairs of a particular group of persons when no identifiable taxpayer is under investigation," and that in order to prevail in an effort to enforce a summons issued under § 7602 the IRS must demonstrate "that it seeks third party records pertaining to the income tax liability of a particular taxpayer in whom it is interested." These propositions, when narrowly construed, are consistent both with the result reached in *Bisceglia* and this Court's ruling in the instant cases. In *Bisceglia* the IRS was refused production of what amounted to an entire month's deposit tickets and cash receipts which the IRS wished to rummage through in an attempt to ascertain the identity of the person or persons who had deposited in equal amounts on two occasions a total of 400 extremely aged and deteriorated $100 bills. The IRS viewed the condition of the currency as suggestive of some possible irregularities in its storage and perhaps its receipt, and so wished to see if its depositor(s) had reported the currency as in-

---

1. Despite the substantial expansion of its purpose clause (*see* p. 321, *supra*) over those of its predecessors, the House and Senate reports on the Internal Revenue Code of 1954 made identical cursory references to § 7602 as containing "no material

change from existing law." *See* 1954 U.S. Code Cong. & Admin.News at 4584, 5268. *But see also* Tillotson v. Boughner, 225 F. Supp. 45, 47, n. 1 (N.D.Ill.1963), aff'd 333 F. 2d 515 (7th Cir. 1964), cert. denied 379 U.S. 913, 85 S.Ct. 260, 13 L.Ed.2d 184.

come. As far as can be judged from the opinion of the court of appeals, this was a fishing expedition if ever there were one, not only because the IRS had no idea of the identity of the depositor(s), but also because the IRS lacked any knowledge of the sort of tax liability which the depositor(s) might possibly have incurred, and could not even indicate with any specificity the particular records it wished produced. It might therefore have been quite proper to deny enforcement of the summons on the grounds of the essentially exploratory rather than investigatory purpose motivating the Service, as determined from all the facts of the case. But a denial of enforcement of the summons could not properly have been premised, nor need *Bisceglia* be read as having been so premised, on the mere fact that the summons was purported to have been issued pursuant to an investigation of "John Doe" rather than of an *identified* taxpayer.

The controlling factor in the instant cases, as opposed to *Bisceglia,* is that the taxpayers being investigated, if not *identified,* were at least easily *identifiable* on the basis of their common characteristic of having owned shares in a specific corporation on a specific day, and this identifying characteristic was set forth on the face of the summonses herein involved. A line of cases distinguished in *Bisceglia* serves to illustrate how an unidentified taxpayer can be sufficiently identifiable to be subject to

an investigation by the IRS, pursuant to which an enforceable summons may issue under § 7602. Tillotson v. Boughner, 333 F.2d 515 (7th Cir. 1964), cert. denied 379 U.S. 913, involved the Service's request pursuant to § 7602 for disclosure of the identity of an attorney, himself acting for a person or persons unknown, on whose behalf a second attorney forwarded to the IRS a cashier's check for $215,499.95. The court of appeals held the request to be within the scope of § 7602: "Defendant argues that only an investigation of a taxpayer whose identity is known is authorized. We reject this argument. Defendant has been summoned to testify concerning a taxpayer who paid a large sum of money, purportedly covering his tax liability. That his name and whereabouts are not known does not discount the fact that *a* taxpayer exists whose tax liability the Internal Revenue Service has statutory authority to investigate." (Emphasis in original.) 333 F.2d at 516.[2] In a subsequent case the second attorney's right to refuse to supply the IRS with the name of his immediate client, the first attorney, was upheld on the basis of the attorney-client privilege, notwithstanding the lawfulness under § 7602 of the Service's request for this information. Tillotson v. Boughner, 350 F.2d 663 (7th Cir. 1965). But in a companion case, the bank which had issued the cashier's check was required to produce pursuant to a § 7602 summons its records pertaining to the funds upon

---

2. When the court emphasized that "*a* taxpayer exists," albeit unidentified, "whose tax liability the Internal Revenue Service has statutory authority to investigate," the court's focus was on the fact that the Service was investigating an actual person or persons who had admitted owing substantial back taxes, and not an undefined, possibly illustory class of persons whose potential tax liability was merely a figment of the Service's as yet unsubstantiated imagination. The court was not basing its finding of investigatory intent simply on the fact that *only one* unidentified taxpayer was involved. This deduction necessarily follows from the terms of the order on appeal in the *Tillotson* cases, which was not limited to a single

unidentified taxpayer. It is clear that it was premised upon the IRS being engaged in an investigation of one or more unidentified taxpayers. As quoted in the later *Tillotson* case, the district court's order enforcing the summons required the summoned attorney " 'to give testimony relating to the tax liability of John Doe, the unknown taxpayer, *or taxpayers,* on whose behalf [the defendant] delivered to the Internal Revenue Service a cashier's check for $215,499.95, dated July 27, 1961, and drawn on the LaSalle National Bank, Chicago, Illinois.' " (Emphasis added.) Tillotson v. Boughner, *supra,* 350 F.2d at 664. See Tillotson v. Boughner, 238 F.Supp. 621, 622 (N.D.Ill.1965), rev'd 350 F.Supp. 663, *supra.*

which the check had been drawn. Schulze v. Rayunec, 350 F.2d 666 (7th Cir. 1965), cert. denied 382 U.S. 919, 86 S.Ct. 293, 15 L.Ed.2d 234.

United States v. Theodore, 479 F.2d 749 (4th Cir. 1973), although relied upon by *Bisceglia,* nonetheless provides authority supporting enforcement of the summonses in the instant cases. *Theodore* involved an IRS investigation of a tax preparer who had prepared inaccurate returns for undercover agents posing as clients. The IRS had for this reason issued a summons under § 7602 which the court of appeals termed "unprecedented in its breadth. IRS is asking for copies of all the returns of all Theodore's clients for the years 1969, 1970 and 1971, and all records, memos, workpapers, etc., pertaining to the returns. We are told that this involves some 1500 returns and accompanying documentation." 479 F.2d at 754. The court then noted that "Courts have in the past sanctioned the use of John Doe summonses, but all such cases involved either a single unidentified taxpayer or a small group of unknown taxpayers," citing the earlier *Tillotson* case. United States v. Theodore, *supra,* 479 F.2d at 754. The court refused to deem such cases controlling of the matter before it, however, in view of the much broader and unspecific request for information involved therein. "[T]he Internal Revenue Service is not to be given unrestricted license to rummage through the office files of an accountant in the hope of perchance discovering information that would result in increased tax liabilities for some as yet unidentified client. Section 7602 summonses were not meant to give the IRS such investigative and inquisitorial power." *Id.* The court indicated that a reasonableness test was to be applied to determine the enforceability of a § 7602 summons, which "will be deemed unreasonable and unenforceable if it is overbroad and disproportionate

to the ends sought." *Id.* This test, applied in the light of § 7602's purpose clause *authorizing the issuance of summons to ascertain the correctness of "any return" or the liability of "any person,"* was held not to authorize "the use of open-ended Joe Doe summonses. Therefore, we find the summons directing [the defendant] to produce all of the returns and all of the work records relating to all of his clients for the years 1969–1971 is too broad and too vague to be enforced." *Id.* at 755. But in its *further application of this reasonableness test,* the court went on to hold that Congress had granted the Commissioner of the IRS "ample power to inquire and obtain the names of [defendant's clients] by the use of the section 7602 summons if the information is not otherwise accessible to him." *Id.* The court accordingly directed the district court to determine if there were "no way short of a manual search to obtain the requested taxpayer lists," and if the IRS were found to have no "reasonable or practical means at its disposal to compile the desired lists," the district court was to enforce the summons to the extent of turning over to the IRS a sealed list on file with the district court bearing the names, addresses, and social security numbers of the defendant's clients. *Id.*[3]

This Court concluded, contrary to the arguments based on *Bisceglia* expressed by the banks opposing enforcement of the summonses in the instant cases, that the Service's knowledge of the name or names of the particular taxpayers whom they are investigating ought not be enshrined as a sine qua non to a finding that a summons under § 7602 is enforceable as an investigatory rather than exploratory summons; such a finding is properly determined upon consideration of all the facts and circumstances in any given case. In United States v. Powell, 379 U.S. 48, 85 S.Ct.

---

3. The other reported cases involving IRS investigations of tax preparers and their clients' returns have reached similar results. *See* United States v. Carter, 489 F.2d 413 (5th Cir. 1973); United States v. Turner, 480 F.2d 272, 279 (7th Cir. 1973); United States v. Berkowitz, 355 F.Supp. 897, 901 (E.D.Pa.1973).

248, 13 L.Ed.2d 112 (1964), the Court declared that the IRS did not have to demonstrate probable cause to suspect a taxpayer of fraud in order to gain judicial enforcement of a summons under § 7602. The Court did, however, make enforcement of a § 7602 summons subject to standards stringent enough to prevent administrative abuse of judicial process. "[The Commissioner] must show that the investigation will be conducted pursuant to a legitimate purpose, that the inquiry [will] be relevant to the purpose, that the information sought is not already within the Commissioner's possession, and that the administrative steps required by the Code have been followed . . ." 379 U.S. at 57–58. An "investigation" not oriented to an ascertainable, if unidentified, taxpayer or group of taxpayers may well be deemed exploratory and hence not "conducted pursuant to a legitimate purpose." Rather than employ the banks' suggested litmus-paper test that a "John Doe" summons can in no circumstances have been issued for a legitimate, i. e., investigatory, purpose, it is appropriate to use a general reasonableness test such as that applied in *Theodore*. Such a test for determining on the basis of all the facts and circumstances of a case whether the IRS is engaged in a legitimate investigation of ascertainable if as yet unidentified taxpayers may readily be derived from that already formulated by the court of appeals for this Circuit for judging the relevancy of material sought by a summons to the investigation in the course of which the summons has purportedly been issued.

"   .   .   .   [J]udicial protection against the sweeping or irrelevant order is particularly appropriate in matters where the demand for records is directed not to the taxpayer but to a third-party who may have had some dealing with the person under investigation. And so this court has held that a District Court asked to enforce such a summons must determine not only whether this burden imposed is unreasonably onerous, but also whether the records sought were relevant to the investigation, not in the sense of an affirmative showing of probable cause, but 'whether the inspection sought might have thrown light upon the correctness of the taxpayer's returns.' Foster v. United States, 265 F.2d 183 (2d Cir., 1959), cert. denied, 360 U.S. 912, 79 S.Ct. 1297, 3 L.Ed.2d 1261 (1960).

"   .   .   .   [T]he Government may not defend a failure to indicate sufficient relationship of records to the investigation solely on the basis that some chance of relevance exists or some possibility of relation remains, and no one can discern more until after examination. The personal interest cannot be so blithely brushed aside. The question, and it is not always one that lends itself easily to solution, is whether from what the Government already knows there exists the requisite nexus between taxpayer and records of another's affairs to make the investigation reasonable—in short, whether the 'might' in the articulated standard, 'might throw light upon the correctness of the return,' is in the particular circumstances an indication of a realistic expectation rather than an idle hope that something may be discovered." United States v. Harrington, 388 F.2d 520, 523–524 (2d Cir. 1968).

Application of this general reasonableness test to determine the investigatory purpose and hence the validity of a "John Doe" summons under § 7602 avoids the stultifying results which in some instances would follow from rigorous application of the banks' construction of *Bisceglia* and its supposed presumption that any "John Doe" summons is void for lack of an investigative purpose simply by virtue of its failure to name the specific taxpayer or taxpayers being investigated. As long ago as 1933 it was held that a corporation which acquired shares in another corporation through an exchange of shares could be required pursuant to § 618 of the Revenue Act of 1928, a predecessor of §

7602, (see p. 321, *supra*), to divulge the names of the exchanging shareholders and the shares each exchanged, so that the IRS could review their returns to see if they had reported any income realized in the exchange. Miles v. United Founders Corporation, 5 F.Supp. 413 (D.N.J.1933). Such a summons would presumably have been used to get the names of the exchanging Hartford shareholders in the instant case, had the corporations involved not produced their transfer lists voluntarily. Yet if it is accepted that a § 7602 summons can properly issue only pursuant to an investigation of an already identified taxpayer or group of taxpayers, even this information held by corporations themselves party to the exchange would be denied to the IRS.[4]

Applying this reasonableness test to the instant cases, this Court held that the Service's specification of the information it wants was sufficiently precise, articulated as it was in terms of the beneficial owners of shares of a particular stock on a particular day, and was sufficiently narrowly drawn, being limited to the names, addresses, Social Security numbers, and shares held of such beneficial owners, to be deemed an investigatory rather than a merely exploratory request for information. The investigation which these summonses were in aid of was rooted in a realistic, known set of definite transactions allegedly taxable. Some 18,000 Hartford shareholders, see Herbst v. International Telephone and Telegraph Corp., 495 F.2d 1308, 1314, n. 12 (2d Cir. 1974), exchanged their shares in May of 1970 for shares of Series 'N' Preferred stock in ITT. Seeking to obtain the true names of those who engaged in that allegedly taxable transaction was not to be compared to the heady fantasy of the IRS in seeking to find out whether or not there might have been some merely possible tax liability attaching to the deposit of $40,000 in aged currency. The mere fact that the banks were technically third parties to the Service's investigation counted little against the enforceability of the summonses. The banks had the information readily at hand, and it thus entailed no significant burden on them to produce it; moreover, the banks possessed the information not because of any incidental role played by them in relation to the Hartford-ITT exchange of shares, but because they had willingly served, for a fee, as institutional aliases for some of the exchanging Hartford

4. It may be that the banks' construction of *Bisceglia* as requiring in every case the actual identification of the taxpayers being investigated through summonses is deemed inapplicable when the summonses are directed to third parties who, while not themselves under investigation, were involved in the transactions upon which the Service's suspicions of some outstanding tax liability are based. But if so, such a qualification only introduces into this otherwise per se rule against "John Doe" summonses the very considerations of reasonableness and the relationship of the summoned party to the target of the Service's inquiries which are the determinative factors in a court's consideration of the enforceability of any summons under § 7602, whether it be a "John Doe" summons or not. Moreover, it is difficult to see how, under such a qualified rule against "John Doe" summonses, the IRS could be allowed to require the corporation whose stock was exchanged to produce the names of the exchanging stockholders, but could not be allowed to require the bank in whose name the exchanged stock was held to produce the names of those for whom it was acting. Certainly the bank is at least as immediate a party to the exchange of stock—the event occasioning the Service's interest—as is the corporation whose stock was exchanged. Thus if as common sense demands the purported *Bisceglia* rule against "John Doe" summonses is indeed subject to an exception for "John Doe" summonses directed to those involved in transactions suspected of having given rise to tax liability on the part of unknown persons, the rule must ultimately be swallowed up by this saving exception. Every time the Service should seek to enforce a "John Doe" summons it would strive to establish that the exception should rule that case by laying before the court the reasonableness of its summons in view of the relationship of the summoned party to the unknown party under investigation.

327

shareholders. *Cf.* California Bankers Association v. Shultz, —— U.S. ——, 94 S.Ct. 1494, 39 L.Ed.2d 812 (1974).

As Judge Frankel has noted: "The familiar anguish about 'fishing expeditions' has been met in this context with the observation that 'the Secretary or his delegate has been specifically licensed to fish by § 7602.'" United States v. Acker, 325 F.Supp. 857, 863 (S.D.N.Y.1971), quoting United States v. Giordano, 419 F.2d 564, 568 (8th Cir. 1969), cert. denied 397 U.S. 1037, 90 S. Ct. 1355, 25 L.Ed.2d 648 (1970). While this license may proscribe the net, it surely permits the spear. If the IRS were fishing in the instant cases, then by specifying the particular date on which the banks held a particular stock, and requesting only the identities and shares held of the particular persons who owned that stock on that day, the IRS remained within the salutary rules of the sport.