## UNITED STATES ET AL. *v.* BISCEGLIA

No. 73–1245.   Argued November 11–12, 1974—
Decided February 19, 1975

*Stuart A. Smith* argued the cause for the United States. With him on the brief were *Solicitor General Bork, Assist-*

*ant Attorney General Crampton,* and *Deputy Solicitor General Wallace.*

*William A. Watson* argued the cause and filed a brief for respondent.[*]

MR. CHIEF JUSTICE BURGER delivered the opinion of the Court.

We granted certiorari to resolve the question whether the Internal Revenue Service has statutory authority to issue a "John Doe" summons to a bank or other depository to discover the identity of a person who has had bank transactions suggesting the possibility of liability for unpaid taxes.

I

On November 6 and 16, 1970, the Commercial Bank of Middlesboro, Ky., made two separate deposits with the Cincinnati Branch of the Federal Reserve Bank of Cleveland, each of which included $20,000 in $100 bills. The evidence is undisputed that the $100 bills were "paper thin" and showed signs of severe disintegration which could have been caused by a long period of storage under abnormal conditions. As a result the bills were no longer suitable for circulation and they were destroyed by the Federal Reserve in accord with established procedures. Also in accord with regular Federal Reserve procedures, the Cincinnati Branch reported these facts to the Internal Revenue Service.

It is not disputed that a deposit of such a large amount of high denomination currency was out of the ordinary for the Commercial Bank of Middlesboro; for example, in the 11 months preceding the two $20,000 deposits in $100 bills, the Federal Reserve had received only 218 $100 bills from that bank. This fact, together with the

---

[*]The American Bankers Assn. filed a brief as *amicus curiae* urging affirmance.

uniformly unusual state of deterioration of the $40,000 in $100 bills, caused the Internal Revenue Service to suspect that the transactions relating to those deposits may not have been reported for tax purposes. An agent was therefore assigned to investigate the matter.

After interviewing some of the bank's employees, none of whom could provide him with information regarding the two $20,000 deposits, the agent issued a "John Doe" summons directed to respondent, an executive vice president of the Commercial Bank of Middlesboro. The summons called for production of "[t]hose books and records which will provide information as to the person(s) or firm(s) which deposited, redeemed or otherwise gave to the Commercial Bank $100 bills U. S. Currency which the Commercial Bank sent in two shipments of (200) two hundred each $100 bills to the Cincinnati Branch of the Federal Reserve Bank on or about November 6, 1970 and November 16, 1970." This, of course, was simply the initial step in an investigation which might lead to nothing or might have revealed that there had been a failure to report money on which federal estate, gift, or income taxes were due.[1] Respondent, however, refused to comply with the summons even though he has not seriously argued that compliance would be unduly burdensome.

In due course, proceedings were commenced in the United States District Court for the Eastern District of

---

[1] The Internal Revenue Service agent testified:

"Q. What possible tax effect could this have on the taxpayer if he is determined?

"A. Well, it could be anything from nothing at all, a simple explanation, or it could be that this is money that has been secreted away for a period of time as a means of avoiding the tax.

. . . . .

"Q. Then you really have not reached first base yet, is that correct?

"A. That's correct."

Kentucky to enforce the summons. That court narrowed its scope to require production only of deposit slips showing cash deposits in the amount of $20,000 and deposit slips showing cash deposits of $5,000 or more which involved $100 bills, and restricted it to the period between October 16, 1970, and November 16, 1970. Respondent was ordered to comply with the summons as modified.

The Court of Appeals reversed, holding that § 7602 of the Internal Revenue Code of 1954, 26 U. S. C. § 7602, pursuant to which the summons had been issued, "presupposes that the [Internal Revenue Service] has already identified the person in whom it is interested as a taxpayer before proceeding." 486 F. 2d 706, 710. We disagree, and reverse the judgment of the Court of Appeals.

## II

The statutory framework for this case consists of §§ 7601 and 7602 of the Internal Revenue Code of 1954, which provide:

"Section 7601.  Canvass of districts for taxable persons and objects.

"(a) General rule.

"The Secretary or his delegate shall, to the extent he deems it practicable, cause officers or employees of the Treasury Department to proceed, from time to time, through each internal revenue district and inquire after and concerning all persons therein who may be liable to pay any internal revenue tax, and all persons owning or having the care and management of any objects with respect to which any tax is imposed.

"Section 7602.  Examination of books and witnesses.

"For the purpose of ascertaining the correctness of any return, making a return where none has been

made, determining the liability of any person for any internal revenue tax . . . or collecting any such liability, the Secretary or his delegate is authorized—

"(1) To examine any books, papers, records, or other data which may be relevant or material to such inquiry;

"(2) To summon the person liable for tax or required to perform the act, or any officer or employee of such person, or any person having possession, custody, or care of books of account containing entries relating to the business of the person liable for tax or required to perform the act, or any other person the Secretary or his delegate may deem proper, to appear before the Secretary or his delegate at a time and place named in the summons and to produce such books, papers, records, or other data, and to give such testimony, under oath, as may be relevant or material to such inquiry; and

"(3) To take such testimony of the person concerned, under oath, as may be relevant or material to such inquiry."

We begin examination of these sections against the familiar background that our tax structure is based on a system of self-reporting. There is legal compulsion, to be sure, but basically the Government depends upon the good faith and integrity of each potential taxpayer to disclose honestly all information relevant to tax liability. Nonetheless, it would be naive to ignore the reality that some persons attempt to outwit the system, and tax evaders are not readily identifiable. Thus, § 7601 gives the Internal Revenue Service a broad mandate to investigate and audit "persons who *may be* liable" for taxes and § 7602 provides the power to "examine any books, papers, records, or other data which may be relevant . . . [and to summon] any person having posses-

sion . . . of books of account . . . relevant or material to such inquiry." Of necessity, the investigative authority so provided is not limited to situations in which there is probable cause, in the traditional sense, to believe that a violation of the tax laws exists. *United States* v. *Powell,* 379 U. S. 48 (1964). The purpose of the statutes is not to accuse, but to inquire. Although such investigations unquestionably involve some invasion of privacy, they are essential to our self-reporting system, and the alternatives could well involve far less agreeable invasions of house, business, and records.

We recognize that the authority vested in tax collectors may be abused, as all power is subject to abuse. However, the solution is not to restrict that authority so as to undermine the efficacy of the federal tax system, which seeks to assure that taxpayers pay what Congress has mandated and to prevent dishonest persons from escaping taxation thus shifting heavier burdens to honest taxpayers. Substantial protection is afforded by the provision that an Internal Revenue Service summons can be enforced only by the courts. 26 U. S. C. § 7604 (b); *Reisman* v. *Caplin,* 375 U. S. 440 (1964). Once a summons is challenged it must be scrutinized by a court to determine whether it seeks information relevant to a legitimate investigative purpose and is not meant "to harass the taxpayer or to put pressure on him to settle a collateral dispute, or for any other purpose reflecting on the good faith of the particular investigation." *United States* v. *Powell, supra,* at 58. The cases show that the federal courts have taken seriously their obligation to apply this standard to fit particular situations, either by refusing enforcement or narrowing the scope of the summons. See, *e. g., United States* v. *Matras,* 487 F. 2d 1271 (CA8 1973); *United States* v. *Theodore,* 479 F. 2d 749, 755 (CA4 1973); *United States* v. *Pritchard,* 438 F. 2d 969 (CA5 1971); *United States* v. *Dauphin Deposit Trust*

*Co.*, 385 F. 2d 129 (CA3 1967). Indeed, the District Judge in this case viewed the demands of the summons as too broad and carefully narrowed them.

Finally, we note that the power to summon and inquire in cases such as the instant one is not unprecedented. For example, had respondent been brought before a grand jury under identical circumstances there can be little doubt that he would have been required to testify and produce records or be held in contempt. In *Blair* v. *United States*, 250 U. S. 273 (1919), petitioners were summoned to appear before a grand jury. They refused to testify on the ground that the investigation exceeded the authority of the court and grand jury, despite the fact that it was not directed at them. Their subsequent contempt convictions were affirmed by this Court:

> "[The witness] is not entitled to set limits to the investigation that the grand jury may conduct. . . . It is a grand inquest, a body with powers of investigation and inquisition, the scope of whose inquiries is not to be limited narrowly by questions of propriety or forecasts of the probable result of the investigation, or by doubts whether any particular individual will be found properly subject to an accusation of crime. As has been said before, the identity of the offender, and the precise nature of the offense, if there be one, normally are developed at the conclusion of the grand jury's labors, not at the beginning." *Id.*, at 282.

The holding of *Blair* is not insignificant for our resolution of this case. In *United States* v. *Powell, supra,* Mr. Justice Harlan reviewed this Court's cases dealing with the subpoena power of federal enforcement agencies, and observed:

> "[T]he Federal Trade Commission . . . 'has a power of inquisition, if one chooses to call it that,

which is not derived from the judicial function. It is more analogous to the Grand Jury, which does not depend on a case or controversy for power to get evidence but can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not.' While the power of the Commissioner of Internal Revenue derives from a different body of statutes, we do not think the analogies to other agency situations are without force when the scope of the Commissioner's power is called in question." 379 U. S., at 57, quoting *United States* v. *Morton Salt Co.,* 338 U. S. 632, 642–643 (1950).

## III

Against this background, we turn to the question whether the summons issued to respondent, as modified by the District Court, was authorized by the Internal Revenue Code of 1954.[2] Of course, the mere fact that the summons was styled "In the matter of the tax liability of John Doe" is not sufficient ground for denying enforcement. The use of such fictitious names is common in indictments, see, *e. g., Baker* v. *United States,* 115 F. 2d 533 (CA8 1940), cert. denied, 312 U. S. 692 (1941), and other types of compulsory process. Indeed, the Courts of Appeals have regularly enforced Internal Revenue Service summonses which did not name a specific taxpayer who was under investigation. *E. g., United States* v. *Carter,* 489 F. 2d 413 (CA5 1973); *United States* v. *Turner,* 480 F. 2d 272, 279 (CA7 1973); *Tillotson* v.

---

[2] Respondent also argues that, even if the summons issued in this case was authorized by statute, it violates the Fourth Amendment. This contention was not passed upon by the Court of Appeals. In any event, as narrowed by the District Court the summons is at least as specific as the reporting requirements which were upheld against a Fourth Amendment challenge by banks in *California Bankers Assn.* v. *Shultz,* 416 U. S. 21, 63–70 (1974).

*Boughner,* 333 F. 2d 515 (CA7), cert. denied, 379 U. S. 913 (1964). Respondent undertakes to distinguish these cases on the ground that they involved situations in which either a taxpayer was identified or a tax liability was known to exist as to an unidentified taxpayer. However, while they serve to suggest the almost infinite variety of factual situations in which a "John Doe" summons may be necessary, it does not follow that these cases define the limits of the Internal Revenue Service's power to inquire concerning tax liability.

The first question is whether the words of the statute require the restrictive reading given them by the Court of Appeals. Section 7601 permits the Internal Revenue Service to investigate and inquire after *"all* persons . . . who *may be* liable to pay *any* internal revenue tax . . . ." To aid in this investigative function, § 7602 authorizes the summoning of *"any* . . . person" for the taking of testimony and examination of books which may be relevant for "ascertaining the correctness of *any* return, . . . determining the liability of *any* person . . . or collecting *any* such liability . . . ." Plainly, this language is inconsistent with an interpretation that would limit the issuance of summonses to investigations which have already focused upon a particular return, a particular named person, or a particular potential tax liability.

Moreover, such a reading of the Internal Revenue Service's summons power ignores the fact that it has a legitimate interest in large or unusual financial transactions, especially those involving cash. The reasons for that interest are too numerous and too obvious to catalog. Indeed, Congress has recently determined that information regarding transactions with foreign financial institutions and transactions which involve large amounts of money is so likely to be useful to persons responsible for enforcing the tax laws that it must be reported by banks.

See generally *California Bankers Assn. v. Shultz,* 416 U. S. 21, 26–40 (1974).

It would seem elementary that no meaningful investigation of such events could be conducted if the identity of the persons involved must first be ascertained, and that is not always an easy task. Fiduciaries and other agents are understandably reluctant to disclose information regarding their principals, as respondent was in this case. Moreover, if criminal activity is afoot the persons involved may well have used aliases or taken other measures to cover their tracks. Thus, if the Internal Revenue Service is unable to issue a summons to determine the identity of such persons, the broad inquiry authorized by § 7601 will be frustrated in this class of cases. Settled principles of statutory interpretation require that we avoid such a result absent unambiguous directions from Congress. See *NLRB v. Lion Oil Co.,* 352 U. S. 282, 288 (1957); *United States v. American Trucking Assns.,* 310 U. S. 534, 542–544 (1940). No such congressional purpose is discernible in this case.

We hold that the Internal Revenue Service was acting within its statutory authority in issuing a summons to respondent for the purpose of identifying the person or persons who deposited 400 decrepit $100 bills with the Commercial Bank of Middlesboro within the space of a few weeks. Further investigation may well reveal that such person or persons have a perfectly innocent explanation for the transactions. It is not unknown for taxpayers to hide large amounts of currency in odd places out of a fear of banks. But on this record the deposits were extraordinary, and no meaningful inquiry can be made until respondent complies with the summons as modified by the District Court.

We do not mean to suggest by this holding that respondent's fears that the § 7602 summons power could be used to conduct "fishing expeditions" into the private affairs

of bank depositors are trivial. However, as we have observed in a similar context:

> " 'That the power may be abused, is no ground for denying its existence. It is a limited power, and should be kept within its proper bounds; and, when these are exceeded, a jurisdictional question is presented which is cognizable in the courts.' " *McGrain* v. *Daugherty,* 273 U. S. 135, 166 (1927), quoting *People ex rel. McDonald* v. *Keeler,* 99 N. Y. 463, 482 (1885).

So here, Congress has provided protection from arbitrary or capricious action by placing the federal courts between the Government and the person summoned. The District Court in this case conscientiously discharged its duty to see that a legitimate investigation was being conducted and that the summons was no broader than necessary to achieve its purpose.

The judgment of the Court of Appeals is reversed and the cause is remanded to it with directions to affirm the order of the District Court.

*It is so ordered.*

MR. JUSTICE BLACKMUN, with whom MR. JUSTICE POWELL joins, concurring.

I join the Court's opinion and its judgment, and add this word only to emphasize the narrowness of the issue at stake here. We decide today that the Internal Revenue Service has statutory authority to issue a summons to a bank in order to ascertain the identity of a person whose transactions with that bank strongly suggest liability for unpaid taxes. Under the circumstances here, there was an overwhelming probability, if not a certitude, that one individual or entity was responsible for the deposits. The uniformly deteriorated condition of the currency and the amount, combined with other unusual

aspects, gave the Service good reason, and, indeed, the duty to investigate. The Service's suspicion as to possible liability was more than plausible.\* The summons was closely scrutinized and appropriately narrowed in scope by the United States District Court.

The summons, in short, was issued pursuant to a genuine investigation. The Service was not engaged in researching some general problem; its mission was not exploratory. The distinction between an investigative and a more general exploratory purpose has been stressed appropriately by federal courts, see, *e. g., United States v. Humble Oil & Refining Co.,* 488 F. 2d 953, 958 (CA5 1974), pet. for cert. pending, No. 73–1827; *United States v. Armour,* 376 F. Supp. 318 (Conn. 1974), and that distinction is important to our decision here.

We need not decide in this case whether the Service has statutory authority to issue a "John Doe" summons where neither a particular taxpayer nor an ascertainable group of taxpayers is under investigation. At most, we hold that the Service is not always required to state a taxpayer's name in order to obtain enforcement of its summons, and that under the circumstances of this case it is definitely not required to do so. We do not decide that a "John Doe" summons is always enforceable where the name of an individual is lacking and the Service's pupose is other than investigative.

Upon this understanding, I join the Court's opinion.

MR. JUSTICE STEWART, with whom MR. JUSTICE DOUGLAS joins, dissenting.

The Court today says that it "recogniz[es] that the authority vested in tax collectors may be abused," *ante,*

---

\*The Service may not have reached "first base," see *ante,* at 143 n. 1, but it had been at bat before, and it knew both the game and the ball park well.

at 146, but it is nonetheless unable to find any statutory limitation upon that authority. The only "protection" from abuse that Congress has provided, it says, is "placing the federal courts between the Government and the person summoned," *ante,* at 151. But that, of course, is no protection at all, unless the federal courts are provided with a measurable standard when asked to enforce a summons. I agree with the Court of Appeals that Congress has provided such a standard, and that the standard was not met in this case. Accordingly, I respectfully dissent from the opinion and judgment of the Court.

Congress has carefully restricted the summons power to certain rather precisely delineated purposes:

> "ascertaining the correctness of any return, making a return where none has been made, determining the liability of any person for any internal revenue tax or the liability at law or in equity of any transferee or fiduciary of any person in respect of any internal revenue tax, or collecting any such liability." 26 U. S. C. § 7602.

This provision speaks in the singular—referring to "the correctness of any return" and to "the liability of any person." The delineated purposes are jointly denominated an "inquiry" concerning "the person liable for tax or required to perform the act," and the summons is designed to facilitate the "[e]xamination of books and witnesses" which "may be relevant or material to such inquiry." 26 U. S. C. §§ 7602 (1), (2), and (3). This language indicates unmistakably that the summons power is a tool for the investigation of particular taxpayers.

By contrast, the general *duties* of the IRS are vastly broader than its summons authority. For instance, § 7601 mandates a "[c]anvass of districts for taxable persons and objects." Unlike § 7602, the canvassing pro-

vision speaks broadly and in the plural, instructing Treasury Department officials

> "to proceed, from time to time, through each internal revenue district and inquire after and concerning *all persons* therein who *may be liable* to pay any internal revenue tax, and *all persons* owning or having the care and management of *any objects* with respect to which any tax is imposed." (Emphasis added.)

Virtually all "persons" or "objects" in this country "may," of course, have federal tax problems. Every day the economy generates thousands of sales, loans, gifts, purchases, leases, deposits, mergers, wills, and the like which—because of their size or complexity—suggest the possibility of tax problems for somebody. Our economy is "tax relevant" in almost every detail. Accordingly, if a summons could issue for any material conceivably relevant to "taxation"—that is, relevant to the general *duties* of the IRS—the Service could use the summons power as a broad research device. The Service could use that power methodically to force disclosure of whole categories of transactions and closely monitor the operations of myriad segments of the economy on the theory that the information thereby accumulated might facilitate the assessment and collection of some kind of a federal tax from somebody. Cf. *United States* v. *Humble Oil & Refining Co.,* 488 F. 2d 953. And the Court's opinion today seems to authorize exactly that.

But Congress has provided otherwise. The Congress *has* recognized that information concerning certain classes of transactions is of peculiar importance to the sound administration of the tax system, but the legislative solution has not been the conferral of a limitless summons power. Instead, various special-purpose statutes have been written to require the reporting or disclosure of particular kinds of transactions. *E. g.,* 26 U. S. C. §§ 6049,

6051–6053, 31 U. S. C. §§ 1081–1083, 1101, and 1121–1122, and 31 U. S. C. §§ 1141–1143 (1970 ed., Supp. III). Meanwhile, the scope of the summons power itself has been kept narrow. Congress has never made that power coextensive with the Service's broad and general canvassing duties set out in § 7601. Instead, the summons power has always been restricted to the particular purposes of individual investigation, delineated in § 7602.[1]

Thus, a financial or economic transaction is not subject to disclosure through summons merely because it is large or unusual or generally "tax relevant"—but only when the summoned information is reasonably pertinent to an ongoing investigation of somebody's tax status. This restriction checks possible abuses of the summons power in two rather obvious ways. First, it guards against an

---

[1] The canvassing duties and the summons power have always been found in separate and distinct statutory provisions. The spatial proximity of the two contemporary provisions is utterly without legal significance. 26 U. S. C. § 7806 (b). The general mandate to canvass and inquire, now found in § 7601, is derived from § 3172 of the Revised Statutes of 1874. See *Donaldson* v. *United States*, 400 U. S. 517, 523–524. The summons power, however, has different historical roots. Section 7602, enacted in 1954, was meant to consolidate and carry forward several prior statutes, with "no material change from existing law." H. R. Rep. No. 1337, 83d Cong., 2d Sess., A436; S. Rep. No. 1622, 83d Cong., 2d Sess., 617. The relevant prior statutes were §§ 3614 and 3615 (a)–(c) of the Internal Revenue Code of 1939. See Table II of the 1954 Code, 68A Stat. 969. Section 3614 granted the summons power to the Commissioner "for the purpose of ascertaining the correctness of any return or for the purpose of making a return where none has been made." Sections 3615 (a)–(c) granted the summons power to "collectors" and provided that a "summons may be issued" whenever "any person" refuses to make a return or makes a false or fraudulent return. Thus, like the present § 7602, these earlier provisions clearly limited use of the summons power to the investigation of particular taxpayers.

overbroad summons by allowing the enforcing court to prune away those demands which are not relevant to the particular, ongoing investigation. See, e. g., *First Nat. Bank of Mobile* v. *United States*, 160 F. 2d 532, 533–535. Second, the restriction altogether prohibits a summons which is wholly unconnected with such an investigation.

The Court today completely obliterates the historic distinction between the general duties of the IRS, summarized in § 7601, and the limited purposes for which a summons may issue, specified in § 7602. Relying heavily on § 7601, and noting that the IRS "has a legitimate interest in large or unusual financial transactions, especially those involving cash," *ante,* at 149, the Court approves enforcement of a summons having no investigative predicate. The sole premise for this summons was the Service's theory that the deposit of old wornout $100 bills was a sufficiently unusual and interesting transaction to justify compulsory disclosure of the identities of all the large-amount depositors at the respondent's bank over a one-month period.[2] That the summons was not incident to an ongoing, particularized investigation, but was merely a shot in the dark to see if one might be warranted, was freely conceded by the IRS agent who served the summons.[3]

---

[2] The summons here used a scattershot technique to learn the identity of the unknown depositor. Rather than merely asking bank officials who the depositor was, the IRS required production of all deposit slips exceeding specified amounts that had been filled out during the period when the suspect deposits were, presumably, made. Thus, enforcement of the summons, even as redrafted by the District Court, will doubtlessly apprise the IRS of the identities of many bank depositors other than the one who submitted the old and wornout $100 bills.

[3] He testified at the enforcement hearing:

"Q. What possible tax effect could this have on the taxpayer if he is determined?

"A. Well, it could be anything from nothing at all, a simple ex-

The Court's opinion thus approves a breathtaking expansion of the summons power: There are obviously thousands of transactions occurring daily throughout the country which, on their face, suggest the *possibility* of tax complications for the unknown parties involved. These transactions will now be subject to forced disclosure at the whim of any IRS agent, so long only as he is acting in "good faith." *Ante,* at 146.

This is a sharp and dangerous detour from the settled course of precedent. The decision of the Court of Appeals in this case has been explicitly accepted as sound by the Courts of Appeals of two other Circuits. See *United States* v. *Berkowitz,* 488 F. 2d 1235, 1236 (CA3), and *United States* v. *Humble Oil & Refining Co.,* 488 F. 2d 953, 960 (CA5), cert. pending, No. 73–1827. No federal court has disagreed with it.

The federal courts have always scrutinized with particular care any IRS summons directed to a "third party," *i. e.,* to a party other than the taxpayer under investigation. See, *e. g., United States* v. *Humble Oil & Refining Co., supra,* at 963; *Venn* v. *United States,* 400 F. 2d 207, 211–212; *United States* v. *Harrington,* 388 F. 2d 520, 523. When, as here, the third-party summons does not identify the party under investigation, a presumption naturally arises that the summons is not genuinely investigative but merely exploratory—a device for general research or for the hit-or-miss monitoring of "unusual" transactions. Unless this presumption is rebutted by the Service, the courts have denied enforcement.

Thus, the IRS was not permitted to summon from a bank the names and addresses of all beneficiaries of cer-

---

planation, or it could be that this is money that has been secreted away for a period of time as a means of avoiding the tax.

.          .          .          .          .

"Q. Then you really have not reached first base yet, is that correct?

"A. That's correct."

tain types of trust arrangements merely on the theory that these arrangements were unusual in form or size. *Mays* v. *Davis,* 7 F. Supp. 596. Nor could the Service force a company to disclose the identity of whole classes of its oil land lessees merely on the theory that oil lessees commonly have tax problems. *United States* v. *Humble Oil & Refining Co., supra.* See also *McDonough* v. *Lambert,* 94 F. 2d 838; *First Nat. Bank of Mobile* v. *United States,* 160 F. 2d, at 533–535; *Teamsters* v. *United States,* 240 F. 2d 387, 390.

On the other hand, enforcement has been granted where the Service has been able to demonstrate that the John Doe summons was issued incident to an ongoing and particularized investigation. Thus, enforcement was granted of summonses seeking to identify the clients of those tax-return-preparation firms which *prior investigation* had shown to be less than honest or accurate in the preparation of sample returns. *United States* v. *Theodore,* 479 F. 2d 749; *United States* v. *Turner,* 480 F. 2d 272; *United States* v. *Berkowitz, supra; United States* v. *Carter,* 489 F. 2d 413. Similarly, enforcement was granted of summonses directed to an attorney, and his bank, seeking to identify the client for whom the attorney had mailed to the IRS a large, anonymous check, purporting to satisfy an outstanding tax deficiency of the client. *Tillotson* v. *Boughner,* 333 F. 2d 515; *Schulze* v. *Rayunec,* 350 F. 2d 666. Like the prior investigative work in the tax-return-preparer cases, the receipt of the mysterious check established the predicate of a particularized investigation which was necessary, under § 7602, to the enforcement of a summons. In each case, the Service had already proceeded to the point where the unknown individual's tax liability had become a reasonable possibility, rather than a matter of sheer speculation.

Today's decision shatters this long line of precedent.

For this summons, there was absolutely no investigative predicate. The sole indication of this John Doe's tax liability was the unusual character of the deposit transaction itself. Any private economic transaction is now fair game for forced disclosure, if any IRS agent happens in good faith to want it disclosed. This new rule simply disregards the language of § 7602 and the body of established case law construing it.

The Court's attempt to justify this extraordinary departure from established law is hardly persuasive. The Court first notes that a witness may not refuse testimony to a grand jury merely because the grand jury has not yet specified the "identity of the offender," *ante,* at 147, quoting *Blair* v. *United States,* 250 U. S. 273, 282. This is true but irrelevant. The IRS is not a grand jury. It is a creature not of the Constitution but of legislation and is thus peculiarly subject to legislative constraints. See *In re Groban,* 352 U. S. 330, 346 (Black, J., dissenting). It is true that the Court drew an analogy between an IRS summons and a grand jury subpoena in *United States* v. *Powell,* 379 U. S. 48, 57, but this was merely to emphasize that an IRS summons does not require the support of "probable cause" to suspect tax fraud when the summons is *issued incident to an ongoing, individualized investigation of an identified party.* A major premise of *Powell* was that an extrastatutory "probable cause" requirement was unnecessary in view of the "legitimate purpose" requirements already specified in § 7602, 379 U. S., at 56–57.

The Court next suggests that this expansion of the summons power is innocuous, at least on the facts of this case, because the Bank Secrecy Act of 1970 [4] itself com-

---

[4] Pub. L. 91–508, 84 Stat. 1114, 12 U. S. C. §§ 1730d, 1829b, 1951–1959, and 31 U. S. C. §§ 1051–1062, 1081–1083, 1101–1105, 1121–1122. See *California Bankers Assn.* v. *Shultz,* 416 U. S. 21.

160

pels banks to disclose the identity of certain cash depositors. *Ante,* at 149–150. Aside from the fact that the summons at issue here forces disclosure of some deposits not covered by the Act and its attendant regulations,[5] the argument has a more basic flaw. If the summons authority of § 7602 allows preinvestigative inquiry into any large or unusual bank deposit, the 1970 Act was largely redundant. The IRS could have saved Congress months of hearings and debates by simply directing § 7602 summonses on a regular basis to the Nation's banks, demanding the identities of their large cash depositors. In *California Bankers Assn.* v. *Shultz,* 416 U. S. 21, we gave extended consideration to the complex constitutional issues raised by the 1970 Act; some of those issues—*e. g.,* whether and to what extent bank depositors have Fourth Amendment and Fifth Amendment rights to the secrecy of their domestic deposits—were left unresolved by the Court's opinion, 416 U. S., at 67–75. If the disclosure requirements in the 1970 Act were already encompassed within the Service's summons power, one must wonder why the Court labored so long and carefully in *Shultz.*

Finally, the Court suggests that respect for the plain language of § 7602 would "undermine the efficacy of the federal tax system, which seeks to assure that taxpayers pay what Congress has mandated and prevents dishonest persons from escaping taxation and thus shifting heavier burdens to honest taxpayers." *Ante,* at 146. But the federal courts have applied the strictures of § 7602, and its predecessors, for many decades without occasioning these

[5] As limited by the District Court, the summons calls for production of deposit slips showing cash deposits in the amount of $20,000 and deposit slips showing cash deposits of $5,000 or more involving $100 bills, for deposits made between October 16 and November 16, 1970. Current regulations under the Bank Secrecy Act require reporting only with respect to cash transactions exceeding $10,000. 31 CFR § 103.22 (1974).

dire effects. If such a danger exists, Congress can deal with it. But until Congress changes the provision of § 7602, it is our duty to apply the statute as it is written.

I would affirm the judgment of the Court of Appeals.