UNITED STATES of America and Woodland R. Morris, Special Agent of the Internal Revenue Service, Petitioners,

v.

DEAK–PERERA & CO., Respondent.

Misc. No. 82–0256.

United States District Court,
District of Columbia.

July 6, 1983.

On Motion for Reconsideration
Aug. 11, 1983.

Gregory S. Hrebiniak, Dept. of Justice, Washington, D.C., for petitioners.

Jamie S. Gorelick, Miller, Cassidy, Larroca & Lewin, Washington, D.C., for respondent.

## MEMORANDUM AND ORDER

JACKSON, District Judge.

This matter is before the Court, on motions assignment, on the application of the Internal Revenue Service ("IRS") to enforce a third-party recordkeeping summons it issued in May, 1982, to Deak-Perera Washington, Inc. ("Deak-Perera") for the production of documents reflecting its transactions in precious metals with one of its customers, one Edward O. Uhrig of Ellicott City, Maryland.[1] Deak-Perera has made return to the order to show cause issued by another judge of this court, and the IRS and Deak-Perera have each, in effect, moved for summary disposition while nevertheless suggesting that issues of fact remain which would preclude the other's motion. They have, however, entered into a Stipulation of Facts from which alone the Court finds the facts hereinafter set forth and concludes that respondent is entitled to prevail.

### I.

Deak-Perera is a financial institution located in the District of Columbia which engages in a variety of monetary transactions, including the exchange of foreign currency, the purchase and sale of precious metal and bullion, and the purchase and sale of foreign drafts and travellers checks. As such, it is a so-called "non-bank financial institution" within the meaning of the Currency and Foreign Transactions Reporting Act, ("Currency Act" or "Act") 31 U.S.C., § 5311 et seq. (1980) by which it is obligated to maintain certain records and file periodic reports with the Department of the Treasury concerning transfers of currency or other monetary instruments in both domestic and international commerce. Specifically, such an institution must file reports of transactions involving the physical transfer of more than $10,000 in currency and certain international shipments of currency or monetary instruments exceeding $5,000. 31 U.S.C., §§ 5313, 5315, 5316; 31 C.F.R. §§ 103.21, 103.22, 103.23. It must also maintain records of certain extensions of credit over $5,000 and international transfers of over $10,000. 31 U.S.C., § 5314; 31 C.F.R., § 103.33. The Act authorizes the Secretary of the Treasury to delegate his duties and powers to appropriate supervis-

---

1. Uhrig, who appears from papers attached to the application to be a self-proclaimed non-taxpayer, is not a party to the proceeding. He was given notice of the summons by Deak-Perera and availed himself of his right under former 26 U.S.C., § 7609(b)(2) to stay its compliance. (The statute has since been amended to require a person whose business transactions or affairs are being investigated to move to quash such a summons if he wishes to prevent compliance, but only as to summons served after December 31, 1982.)

ing agencies, 31 U.S.C., § 5318, and he has done so by regulation, assigning enforcement authority to, *inter alia,* the Comptroller of the Currency (national banks); the Board of Governors of the Federal Reserve System (state banks belonging to the System); the Federal Home Loan Bank Board (insured thrift institutions); the SEC (securities broker-dealers); and various others. The IRS is assigned the residuary category into which Deak-Perera falls. 31 C.F.R., § 103.46(8).

Thus it happened that in May, 1980, Revenue Agent Robert G. Heilig of the Baltimore District Director's office began a compliance inspection of Deak-Perera under the Act which he initiated by his written request of Deak-Perera to be allowed to inspect certain forms it had filed, its source documents of daily financial transactions, and account records of individual account holders for the period 1977 to date. (Stips. 1, 2).[2] The purpose of inspection was to assure Deak-Perera's compliance with its obligations under the Act, viz., to report all cash transactions over $10,000 and certain foreign shipments of cash or bearer instruments, and to keep appropriate records. (Stip. 3).

Heilig was permitted to review Deak-Perera's records of foreign currency and precious metals transactions, travellers' check sales, and overseas remittances, in the course of which he made notes on every transaction in excess of $10,000—whether reportable under the Act or not (and most were not)—memorializing such data as transaction dates as well as amounts, and the customers' names. (Stips. 5, 6). Deak-Perera protested the practice as an invasion of its customers' privacy and was informed by the IRS District Director that Heilig was taking names and dates only to enable him to aggregate the transactions to determine if reportable transactions had been disguised by dividing them into several smaller non-reportable ones. Heilig was not, the District Director assured Deak-Perera, conducting "so-called fishing expeditions." Deak-Perera allowed the inspection to continue, and Heilig continued to make notes. (Stip. 7). From those notes Heilig prepared Audit Information Reports ("AIRs") on every *sale* of precious metals to (but no purchases from) Deak-Perera involving $25,000 or more, whether in cash (i.e., reportable) or otherwise (not reportable)—83 transactions in all—setting forth the customer's name, address, social security number, telephone number, and transaction date, and dispatched the AIRs to the customers' respective local IRS field offices for the admitted purpose of facilitating audits of the customers' tax returns (and for no purpose whatsoever having to do with the reporting requirements of the Currency Act; none of the transactions were apparently reportable). (Stips. 10–13, 15).

One such AIR sent to Baltimore referred to a sale of foreign coins by Uhrig to Deak-Perera in April, 1980. Special Agent Woodland R. Morris, who had information from an independent source with respect to some seven other Uhrig transactions in precious metals with an "unknown dealer," initiated his own investigation of Uhrig on the basis of the AIR from Heilig (which disclosed only the single transaction with Deak-Perera) and caused the instant summons to issue for "any and all records" pertaining to Edward O. Uhrig and/or Evelyn T. Uhrig for the years 1979–81, including but not limited to records of precious metals transactions paid in cash or by check. The summons would not have issued but for Heilig's report. (Stips. 17–20, IRS Summons of May 6, 1982).

## II.

The federal courts, as a rule, have a fairly limited role in the enforcement of administrative subpoenas. While their function is "neither minor, nor ministerial,"

---

2. Neither the Act nor the regulations apparently provide in so many words for a right of inspection. The regulations do state, however, that inspections are *not* authorized ". . . except for the purpose of assuring compliance with the recordkeeping and reporting requirements . . . [and] other inspection, review or access to such records is governed by other applicable law." 31 C.F.R., § 103.51.

*Oklahoma Press Publishing Co. v. Walling,* 327 U.S. 186, 217 n. 56, 66 S.Ct. 494, 509–510 n. 56, 90 L.Ed. 614 (1946), they are to limit inquiry into collateral matters because of the importance of expeditious enforcement, *FTC v. Texaco, Inc.,* 555 F.2d 862, 872 (D.C. Cir.1977), and a subpoena is generally to be enforced so long as the agency demonstrates that the investigation is being "conducted pursuant to a legitimate purpose, that the inquiry may be relevant to that purpose, that the information sought is not already within the [agency's] possession, and that the administrative steps required by the [statute] have been followed...." *United States v. Powell,* 379 U.S. 48, 57–58, 85 S.Ct. 248, 254–255, 13 L.Ed.2d 112 (1964). It is to be remembered, however, that it *is* the court's process which is invoked, and the "court may not permit its process to be abused," i.e., if the summons has been issued for an improper purpose "... or for any other purpose reflecting on the good faith of the particular investigation." *Id.* at 58, 85 S.Ct. at 255.

The IRS asserts that the compliance audit of Deak-Perera was one of the "regulatory inspections [which] further urgent federal interest[s]," *United States v. Biswell,* 406 U.S. 311, 317, 92 S.Ct. 1593, 1597, 32 L.Ed.2d 87 (1972), as to which regulated businesses have little in the way of justifiable expectations of privacy and may be required simply to satisfy "official curiosity ... that corporate behavior is consistent with the law and the public interest." *United States v. Morton Salt Co.,* 338 U.S. 632, 651–52, 70 S.Ct. 357, 368–369, 94 L.Ed. 401 (1950). *See G.M. Leasing Corp. v. United States,* 429 U.S. 338, 353, 97 S.Ct. 619, 629, 50 L.Ed.2d 530 (1977). Having acceded to an inspection it had no right to refuse, *United States v.*

*Biswell, supra,* the IRS argues, Deak-Perera cannot object that the information Agent Heilig took away with him—particularly the sort having a "high degree of usefulness in criminal, tax, or regulatory investigations or proceedings" which justified the Currency Act as constitutionally valid in the first place, *California Bankers' Association v. Shultz,* 416 U.S. 21, 37, 94 S.Ct. 1494, 1505, 39 L.Ed.2d 812 (1974)—was not exactly what he started out looking for, given the coincidence of the dual capacity in which the records might be of interest to the IRS. And the summons which followed, it says, is altogether consistent with the IRS' "broad mandate" to investigate and audit persons who may be liable for taxes, and in connection therewith to summon *any* person to produce records relevant or material to the inquiry as it is empowered to do by 26 U.S.C., § 7602. *United States v. Bisceglia,* 420 U.S. 141, 145–46, 95 S.Ct. 915, 918–919, 43 L.Ed.2d 88 (1975).

Deak-Perera responds that it was cozened. Assuming (but without conceding, in the absence of any express statutory or regulatory provision) that the IRS had a right to conduct a compliance audit of its records, the records which could be audited of right were those having to do with its own recordkeeping and reporting obligations under the Currency Act, not those which might bear upon its customers' tax liabilities.[3] Had it known in advance the use to which the extraneous information those records contained would be put, Deak-Perera says, it would have supplied Heilig with redacted records. It relied, however, upon the IRS' implied representation at the outset and the express reassurance in mid-audit that Deak-Perera alone was the sub-

---

**3.** Deak-Perera asserts that as a financial institution subject to the Act it possesses its own Fourth Amendment rights in the information contained in its records, notwithstanding it is invoking them here only to the vicarious benefit of a customer. The compliance audit apparently disclosed no irregularities in Deak-Perera's recordkeeping or reporting under the Act. IRS has not challenged Deak-Perera's standing to resist the summons, but the Court assumes standing without finding it. *Compare California Bankers Association v. Shultz, supra,* 416

U.S. at 44, 94 S.Ct. at 1509 ("... plaintiff [bank] has standing as an affected bank" to litigate the constitutional issues raised by the Act) *with id.,* at 51–52, 94 S.Ct. at 1512–1513 ("whether the bank might rely on an injury to its depositors, or ... is governed by the general rule that one has standing only to vindicate his own rights ... need not now be decided ... Claims of depositors against the compulsion by lawful process of bank records involving the depositors' own transactions must wait until such process issues.").

ject of the inspection in giving it access to its original books of entry.

### III.

■■■ If regulatory inspections are not inhibited by requirements of warrants or probable cause, neither are they altogether free of the other constraints of reasonableness of the Fourth Amendment. "Where Congress has authorized inspection but made no rules governing the procedure that inspectors must follow, the Fourth Amendment and its various restrictive rules apply." *Colonnade Catering Corp. v. United States,* 397 U.S. 72, 77, 90 S.Ct. 774, 777, 25 L.Ed.2d 60 (1970); *See v. City of Seattle,* 387 U.S. 541, 543–46, 87 S.Ct. 1737, 1739–1741, 18 L.Ed.2d 943 (1967). And if the Currency Act and the implementing regulations contemplate such compliance audits as the IRS made of Deak-Perera here, they clearly do not purport to authorize a general sharing of incidental intelligence so acquired, even intra-agency, if to do so would violate the subject's legitimate expectations for its privacy. *Compare United States v. Sells Engineering, Inc.,* —— U.S. ——, 103 S.Ct. 3133, 77 L.Ed.2d 743 (1983). At least to the extent the IRS was enabled to obtain from Deak-Perera's records information having no bearing upon the ostensible purpose of its inspection, although of interest to it in another capacity, its access to that information depended entirely upon Deak-Perera's consent. But acquiescence to a claim of lawful authority which does not exist is no consent at all. *Bumper v. North Carolina,* 391 U.S. 543, at 549–50, 88 S.Ct. 1788, at 1792, 20 L.Ed.2d 797 (1968). Nor is consent obtained by stealth or subterfuge. *Gouled v. United States,* 255 U.S. 298, 305–06, 41 S.Ct. 261, 263–264, 65 L.Ed. 647 (1921).

Here Deak-Perera, desiring to demonstrate itself a law-abiding citizen, took the IRS at its word and disclosed to it information it had a right to refuse to reveal. For its part the IRS allowed Deak-Perera to entrust it with information it did not need, had no right to acquire, and represented it would not misuse when asked about it, creating in the process an expectation of privacy for it whether or not one existed before. It may not now use the knowledge so gained "to call upon the owners in a more regular form" to produce it once more. *See Silverthorne Lumber Co. v. United States,* 251 U.S. 385, 391, 40 S.Ct. 182, 64 L.Ed. 319 (1920).

There are undeniably instances in which the government is not only permitted to dissemble but must of necessity do so to discharge its criminal law enforcement responsibilities. *See United States v. Kelly,* 707 F.2d 1460, 1468–69 (D.C.Cir.1983); *Northside Realty Associates, Inc. v. United States,* 605 F.2d 1348 (5th Cir.1979). In the less hostile environment of regulatory inspections, however, a higher level of candor may reasonably be expected of it. As the U.S. Court of Appeals for the Fifth Circuit said in *SEC v. ESM Government Securities, Inc.,* 645 F.2d 310 (5th Cir.1981), denying enforcement of an SEC investigative subpoena for the formal production of records of which it first learned by ruse:

> We believe that a private person has the right to expect that the government, when acting in its own name, will behave honorably. When a government agent presents himself to a private individual, and seeks that individual's cooperation based on his status as a government agent, the individual should be able to rely on the agent's representations. We think it clearly improper for a government agent to gain access to records which would otherwise be unavailable to him by invoking the private individual's trust in his government, only to betray that trust. When that government agency then invokes the power of a court to gather the fruits of its deception, we hold that there is an abuse of process. 645 F.2d at 316.

For the foregoing reasons, therefore, it is, this 6th day of July, 1983,

ORDERED, that petitioners' application to enforce the Internal Revenue Service summons of May 6, 1982, to Deak-Perera of Washington, Inc., is denied, the order to

show cause is discharged, and the summons is quashed.

## ON MOTION FOR RECONSIDERATION

Petitioner IRS has moved for reconsideration of the Court's Memorandum and Order of July 6, 1983, denying enforcement of its investigative subpoena issued to respondent Deak-Perera pursuant to 26 U.S.C. § 7602, citing, for the first time, the case of *United States v. Calandra,* 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974), as "controlling." *Calandra,* it asserts, impairs *Silverthorne Lumber Co. v. United States,* 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920), as authority for the proposition for which the Court cited it, viz., that evidence first acquired by a Fourth Amendment transgression may not thereafter, once restored to the victim's possession, be reacquired by legal process as if the violation had never occurred.

*Calandra* is undoubtedly relevant authority. The majority held in *Calandra* that the exclusionary rule does not extend to grand jury proceedings, and that a target witness before a grand jury may not, therefore, decline to answer, on Fourth Amendment grounds, a question about a crime of which he would never have been suspected but for an unlawful seizure. (He retains, of course, his Fifth Amendment rights.) In distinguishing *Silverthorne,* 414 U.S. at 352 n. 8, 94 S.Ct. at 622 n. 8, however, the majority noted, *inter alia,* that in *Silverthorne* the subpoena had been issued to "recaptur[e] the original documents" as "useful" in a forthcoming criminal prosecution, which appears to be the purpose for which the subpoena was issued here, since the IRS now knows—whether it is entitled to or not— what respondent's original records will disclose about the taxpayer's business with it.

The majority also observed in *Calandra* that the exclusionary rule's "primary purpose" is to deter future unlawful conduct by government agents, not to redress past injury to its victims, and that "[a]s with any remedial device, the application of the rule [is] restricted to those areas where its remedial objectives are ... most efficaciously served." 414 U.S. at 347–48, 94 S.Ct. at 619, 620. Assuming *arguendo* that a single IRS special agent possesses all the attributes of a grand jury as a "grand inquest," *see Blair v. United States,* 250 U.S. 273, 282, 39 S.Ct. 468, 471, 63 L.Ed. 979 (1919), when he issues a subpoena, and that it is, indeed, the spirit of the exclusionary rule which inhibits this Court's finding of an abuse of process in the agent's use of the subpoena here, the Court remains of the opinion that to decline to enforce it will have the salutary effect of deterring calls for regulatory inspections to gain *entre* to an inspectee's premises on less benign errands and that its original ruling is, thus, consistent with *Calandra.*

For the foregoing reasons, therefore, it is, this 17th day of August, 1983,

ORDERED, that petitioner's motion for reconsideration is denied.