109 F.3d 1221
 79 A.F.T.R.2d 97-1793, 97-1 USTC P 50,351
 2121 ARLINGTON HEIGHTS CORP., Plaintiff-Appellant,
v.
INTERNAL REVENUE SERVICE, Robert E. Rubin, Secretary of the
Treasury, Margaret M. Richardson, Commissioner of
Internal Revenue, and Victoria Fedele,
Internal Revenue Agent,
Defendants-Appellees.
 No. 96-2888.
 United States Court of Appeals,
Seventh Circuit.
 Argued Feb. 19, 1997.
Decided March 31, 1997.
 
 Robert P. Sheridan (argued), Chicago, IL, for Plaintiff-Appellant.
 Charles E. Brookhart, Annette M. Wietecha, Pamela C. Berry (argued), Department of Justice, Tax Division, Appellate Section, Jennifer M. Blunt, Department of Justice, Tax Division, Washington, DC, Thomas P. Walsh, Office of the United States Attorney, Civil Division, Chicago, IL, for I.R.S.
 Charles E. Brookhart, Pamela C. Berry, Department of Justice, Tax Division, Appellate Section, Thomas P. Walsh, Office of the United States Attorney, Civil Division, Chicago, IL, for Robert E. Rubin, Margaret M. Richardson, Victoria Fedele.
 Before POSNER, Chief Judge, and ROVNER and EVANS, Circuit Judges.
 TERENCE T. EVANS, Circuit Judge.
 
 
 1
 The Wellington, a popular restaurant in suburban Chicago owned by the 2121 Arlington Heights Corporation, currently finds itself under the microscope of an Internal Revenue Service audit of its 1992 and 1993 tax returns. During the course of the audit the IRS issued an administrative summons to the local phone company, Ameritech, requesting a list of the restaurant's outgoing phone calls from May 1994 through October 1995. The Wellington asked the district court to quash the summons. The government countered with a motion for enforcement. The district court thought the government had the better argument and enforced the summons. The Wellington, unhappy with this decision, appeals.
 
 
 2
 In 1995 the IRS decided to take a look at the Wellington's tax returns. Based on its projections, the IRS estimated that the Wellington underreported its income by $500,000 to $1.5 million in 1992 and 1993. As a result, the IRS dispatched revenue agent Victoria Fedele to the scene. Agent Fedele quickly learned that the audit would not be a walk in the park. The Wellington did not bother to retain its cash register tapes or guest checks, but instead merely summarized its cash intake on daily reports. The Wellington's attorney also let Agent Fedele know that any accounts receivable records retained by the restaurant would not be turned over without a fight.
 
 
 3
 Agent Fedele concluded that because the Wellington had not retained sufficient source records to substantiate the figures listed on its tax return, she would need to reconstruct the restaurant's income. She first attempted to accomplish that feat by tallying up the quantity of meat purchased during the audit period, converting that amount into a projected number of entrees, and in turn, calculating the income those entrees would have brought in for the Wellington. Using that approach, Agent Fedele figured the Wellington had hidden $1.6 million from Uncle Sam in 1992 alone. Although the Wellington apparently has a beef with the formula Agent Fedele used to convert meat purchases into an estimated number of entrees, that issue is not before us.[1] Rather, this case deals only with Agent Fedele's second attempt to reconstruct the restaurant's income.
 
 
 4
 According to Agent Fedele, the Wellington's accountant let slip that a substantial share of the restaurant's business came from banquets set up by repeat customers. As a result, she decided to reconstruct income by tracking down the Wellington's cash-paying banquet customers. The restaurant disputed the characterization of their banquet business as "substantial." Instead, the Wellington preferred the term "moderate." As evidence of the "moderate" nature of that aspect of its business, the Wellington gave Agent Fedele a list purportedly naming all 21 of the restaurant's repeat banquet customers. Because the restaurant did not retain any banquet contracts, appointment books, or cash receipts, however, Agent Fedele thought better of taking the Wellington's word for its banquet clientele. Instead, she decided to flush out that group of customers by examining the restaurant's outgoing phone calls.
 
 
 5
 Agent Fedele's plan ran into a little snag. Because Ameritech only retains "mudd sheets"--lists of all outgoing calls made on a given phone line--for 18 months, the Wellington's phone records from 1992 and 1993 had already been destroyed. Rather than giving up on her quest to track down the Wellington's banquet income, Agent Fedele figured that the Wellington's mudd sheets, however recent, might shed some light on repeat customers who had held banquets at the restaurant during the audit period. Agent Fedele reasoned that calling repeat customers might help her locate cash payments, if any, which didn't find their way into the Wellington's books. As a result, on November 2, 1995, Agent Fedele requested that an administrative summons be issued under I.R.C. § 7602 ordering Ameritech to provide a list of the Wellington's outgoing phone calls from May 1994 through October 1995. Catherine Vaughn, Agent Fedele's group manager, signed off on the request a week later.
 
 
 6
 The Wellington filed a petition to quash the summons under I.R.C. § 7609(b)(2). First, the Wellington alleged the summons would impermissibly allow the IRS to stick its nose into the private lives of the restaurant's employees. That is, the restaurant explained, because its employees-over 100 of them--were not allowed to leave the premises during their shifts, they were granted the privilege of using the restaurant's phone to make personal calls. Second, despite its claim that it made "no calls on the telephones in question, but rather all such [calls] were made by the employees," the Wellington argued that calling the numbers listed on the mudd sheets would ruin its business. It alleged that diners, fearing they would become entangled in an IRS investigation, would shy away from the restaurant. Third, the Wellington alleged that the information targeted by the summons was irrelevant. The restaurant stressed that most banquets would be arranged through incoming--not outgoing--calls and that the mudd sheets targeted by the summons did not cover the tax years under audit. Finally, the Wellington claimed Agent Fedele requested the summons as a sinister attempt to ruin the restaurant's business and pressure it into settling its alleged tax liability. In support, the Wellington pointed to the affidavit of its accountant, which stated:I requested a meeting with [Agent Fedele's] group manager, to discuss the pending audit and how it might be resolved. Agent Fedele responded that there would be no such meeting, and that the only way to resolve the matter was by the payment of additional tax as assessed by her, and that if the tax was not paid she would ruin their business by contacting their suppliers, customers and by standing at the very door of the premises as need be. "I can make their life miserable," she told me. At another point, she told me that if my client didn't sign a document to extend the statute of limitations, she "wouldn't be talking to anybody."
 
 
 7
 As is customary when a taxpayer asks the district court to put the kibosh on an IRS summons, the government countered with an application for enforcement under I.R.C. § 7604. On July 29, 1996, after denying the Wellington's request for an evidentiary hearing, the district court sided with the government. The court first noted because the restaurant had not saved sufficient source records, the IRS was entitled to reconstruct its income using any reasonable means. Next, the court found that the mudd sheets may be relevant to the audit and dismissed the Wellington's allegations as "self-serving, inconsistent and exaggerated." Finally, the court concluded that although Agent Fedele had used "tough language," the Wellington had not shown that the IRS had acted in bad faith.
 
 
 8
 The Wellington first argues the district court should have quashed, rather than enforced, the summons. While the Wellington's motion to quash the summons and the IRS's application for enforcement were based on different provisions of the tax code, the parties' burdens and the process used to resolve both claims are the same. First, the government must make a prima facie case that the IRS issued the summons in good faith. United States v. Kis, 658 F.2d 526, 536 (7th Cir.1981), cert. denied, 455 U.S. 1018, 102 S.Ct. 1712, 72 L.Ed.2d 135 (1982); United States v. Gertner, 65 F.3d 963, 966 (1st Cir.1995). That isn't much of a hurdle. The government must only show: the investigation underlying the summons has a legitimate purpose; the information sought may be relevant to that purpose; the information is not already in the IRS's hands; and the IRS has followed the statutory steps for issuing a summons. United States v. Powell, 379 U.S. 48, 57-58, 85 S.Ct. 248, 254-55, 13 L.Ed.2d 112 (1964). The government typically makes that showing through the affidavit of the revenue agent conducting the audit. Kis, 658 F.2d at 536. This case is no exception. In her affidavit Agent Fedele declared that the IRS was auditing the Wellington; the mudd sheets might help her reconstruct the Wellington's income by exposing repeat banquet customers and tracing their payments for banquets held in 1992 and 1993; the IRS didn't already have the information; and the IRS complied with the tax code when it issued the summons. That declaration touches all the bases covered by Powell.
 
 
 9
 Because the government met its burden, the ball falls in the Wellington's court to show that enforcement of the summons would constitute an abuse of process. It can do that either by disproving the existence of one of the Powell factors or pointing to specific facts suggesting that the IRS issued the summons in bad faith. See United States v. Stuart, 489 U.S. 353, 360, 109 S.Ct. 1183, 1188, 103 L.Ed.2d 388 (1989); Powell, 379 U.S. at 58, 85 S.Ct. at 255; United States v. Michaud, 907 F.2d 750, 752 (7th Cir.1990); Kis, 658 F.2d at 538. The Wellington claims it can do both. The restaurant contends the summons seeks irrelevant information, invades its employees' privacy rights, would ruin its business, and was issued in bad faith as an attempt to coerce the restaurant into conceding its assessed tax deficiency. The Wellington's first three contentions go nowhere. First, the standard for relevancy in summons enforcement cases is relaxed. The mudd sheets must only be "relevant" in the sense that they have the potential to shed some light on any aspect of the Wellington's income. United States v. Arthur Young & Co., 465 U.S. 805, 814-15, 104 S.Ct. 1495, 1501-02, 79 L.Ed.2d 826 (1984) (noting that Powell merely requires that the records sought "may be relevant"). The district court found that the records had the potential to expose repeat banquet customers, who might in turn be able to lead Agent Fedele to cash payments made for banquets held in 1992 and 1993. Because we cannot say those findings are clearly erroneous, we find the district court properly concluded that the phone records in question "may be relevant" to reconstructing the Wellington's income.
 
 
 10
 We also reject the Wellington's argument that the summons would impermissibly infringe upon its employees' privacy rights. Although IRS investigations "unquestionably involve some invasion of privacy, they are essential to our self-reporting system," United States v. Bisceglia, 420 U.S. 141, 146, 95 S.Ct. 915, 918-19, 43 L.Ed.2d 88 (1975), and "[w]hile § 7602 is 'subject to the traditional privileges and limitations,' any other restrictions on the IRS summons power should be avoided 'absent unambiguous directions from Congress.' " Arthur Young, 465 U.S. at 816, 104 S.Ct. at 1502 (citations omitted). We find no traditional limitation or clear signal from Congress at work here. Rather, we are confident any disruption of the employees' private lives will not be so significant as to trump the "congressional policy choice in favor of disclosure of all information relevant" to the IRS's audit of the Wellington's tax returns. Id. at 816-17, 104 S.Ct. at 1502 (emphasis in original). After all, we assume that Agent Fedele will simply call the numbers listed on the mudd sheets, identify herself as an IRS agent, inquire whether the recipients of the calls would mind answering a few questions, and then ask the recipients if they ever paid for banquets held at the Wellington in 1992 or 1993. Recipients answering that question in the negative--as most of the people receiving personal calls from the Wellington's employees undoubtedly would--would find their conversations at an end. No information about which employee called what numbers would even be disclosed. That does not seem like a significant invasion into the employees' personal lives. Cf. United States v. Moore, 970 F.2d 48 (5th Cir.1992) (rejecting claim of doctor-patient privilege and enforcing summons for the names and addresses of a psychiatrist's patients during an investigation of the psychiatrist's failure to file tax returns).
 
 
 11
 We are also not persuaded that allowing Agent Fedele to call the numbers listed on the mudd sheets would destroy the Wellington's business. As the district court pointed out, the Wellington's argument is both "exaggerated" and "inconsistent." In its petition to quash the summons, the Wellington alleged that all of the calls made on its telephone were placed by employees and that a vast majority of those calls were personal in nature. If that's the case, how would calling the numbers listed on the mudd sheets scare away customers? And even if the mudd sheets would enable Agent Fedele to reach out and touch some of the Wellington's customers, we agree with the district court that those calls would not deliver a fatal blow to the restaurant's business. It seems doubtful that patrons would steer clear of the Wellington simply out of fear they would be, as the restaurant put it, "sucked into some kind of difficulty with the IRS." An audit is simply not the scarlet letter the Wellington would have us believe.
 
 
 12
 The Wellington's final challenge to the summons also fails to bring home victory. The Wellington claims Agent Fedele issued the summons to pressure the restaurant into settling its alleged tax liability. In support, the restaurant points to a bit of evidence it considers a smoking gun--Agent Fedele's "threat" to ruin the Wellington's business. To further bolster its bad-faith claim, the Wellington says that although Agent Fedele tried to reconstruct its income by converting the amount of meat purchased into a projected number of entrees sold, she refused to view a videotape (we described this tape in our first footnote) depicting the restaurant's meat preparation techniques.
 
 
 13
 In response, the government asserts that even if Agent Fedele made the "threat" outlined in the accountant's affidavit, the proper inquiry is whether the IRS--as an institution--acted in good faith. In support, the government cites United States v. LaSalle National Bank, 437 U.S. 298, 98 S.Ct. 2357, 57 L.Ed.2d 221 (1978). In LaSalle, the Court addressed whether a summons had been issued to help pin down civil tax liability or instead was sent solely to garner evidence for use in a criminal prosecution. At the time, an administrative summons could only be issued if the underlying investigation was being conducted for a civil purpose.[2] The taxpayer moved to quash the summons, claiming the IRS agent conducting the audit had visions of criminal charges dancing in his head. The Court rejected the claim, finding the line between a permissible civil and impermissible criminal purpose could not be drawn based on an individual agent's intent. The Court reasoned such a focus would "unnecessarily frustrate the enforcement of the tax laws by restricting the use of the summons according to the motivation of a single agent without regard to the enforcement policy of the Service as an institution." Id. at 316, 98 S.Ct. at 2367. As a result, the Court held that whether a summons was issued for a legitimate purpose can only be determined by examining the "institutional posture" of the IRS. Id.
 
 
 14
 While the central issue in LaSalle is now a dead letter, we agree with the government that LaSalle's "institutional posture" test governs this case. See United States v. Millman, 822 F.2d 305, 307 (2d Cir.1987). As a result, in order to make out a claim of bad faith, the Wellington must show that the IRS, as an institution, issued the summons with the intent to pressure the restaurant into settling its alleged tax liability. But that does not mean Agent Fedele's threat to ruin the Wellington's business is irrelevant to the IRS's institutional posture. As LaSalle recognized, "examination of agent motive may be necessary to evaluate the good faith factors of Powell, for example, to consider whether a summons was used to harass a taxpayer." 437 U.S. at 316 n. 17, 98 S.Ct. at 2367 n. 17. See also Millman, 822 F.2d at 307 (stating that an individual agent's motive "may be relevant to the determination of the IRS's posture").
 
 
 15
 We find that the district court properly applied the institutional posture test. The district court first addressed the affidavit of the Wellington's accountant, calling Agent Fedele's statements "tough language." Then, after noting that the Wellington only found itself in a bind because it had failed to retain sufficient source records, the court found Agent Fedele's "tough language" was simply "not enough to show bad faith on the part of the government." That finding does not amount to clear error. The Wellington did not point to any facts suggesting Agent Fedele's motivation infected the institutional posture of the IRS. For example, the Wellington did not make a preliminary showing that Catherine Vaughn, the IRS officer approving Agent Fedele's request for the summons, was motivated by an illegitimate purpose. See LaSalle, 437 U.S. at 315, 98 S.Ct. at 2366-67 (noting that the IRS's "layers of review provide the taxpayer with substantial protection against the hasty or overzealous judgment of the special agent").
 
 
 16
 That leaves just one issue. The Wellington claims it was entitled to an evidentiary hearing on its petition to quash the summons. This is an uphill battle. Summons enforcement proceedings "are intended to be summary in nature," Kis, 658 F.2d at 543, and whether a hearing is needed is left to the district court's discretion. Tiffany Fine Arts, Inc. v. United States, 469 U.S. 310, 324 n. 7, 105 S.Ct. 725, 732 n. 7, 83 L.Ed.2d 678 (1985). The government conceded that Agent Fedele made the statements described in the accountant's affidavit. Therefore, the only issue left in dispute was whether her alleged desire to give the Wellington a hard time had become the IRS's institutional posture. As we have already discussed, the Wellington did not point to any facts suggesting that was the case. It follows, then, that no hearing was required and the district court did not abuse its discretion when it declined to convene one.
 
 
 17
 The district court's order enforcing the summons is
 
 
 18
 AFFIRMED.
 
 
 
 [1]
 For example, Agent Fedele assumed that a 23-pound slab of untrimmed pork would provide enough meat for 46 entrees. The Wellington asserts that generous portions are its hallmark, and 23 pounds of meat, once deboned and properly trimmed, would serve far fewer than 46 hungry customers. In an effort to demonstrate the "real" number of entrees a given amount of bulk meat produces, the Wellington prepared a videotape depicting its attorney and a kitchen employee hard at work trimming meat. Agent Fedele passed up a couple of opportunities to watch the tape. Although the reasonableness of Agent Fedele's calculations is not at issue in this case, the Wellington alleges Agent Fedele's refusal to view the tape bolsters its claim that she is conducting this audit in bad faith
 
 
 [2]
 The tax code has since been amended to allow a summons to be issued in connection with any investigation which has not yet been referred to the Department of Justice for possible criminal charges. See I.R.C. § 7602(c)